

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-23-2008

# Doe v. PA Bd Probation

Precedential or Non-Precedential: Precedential

Docket No. 05-4200

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Doe v. PA Bd Probation" (2008). *2008 Decisions.* Paper 1647.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1647

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-4200
_____

JOHN DOE a/k/a D.T.C.

v.

THE PENNSYLVANIA BOARD OF PROBATION AND
PAROLE; STATE POLICE COMMISSIONER JEFFREY B.
MILLER; APPOINTED BOARD CHAIR
CATHERINE C. MCVEY

Chairman of the Pennsylvania Board of Probation and Parole
Catherine C. McVey; Commissioner of the Pennsylvania State
Police Jeffrey B. Miller,
Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(D.C. No. 01-cv-03639)
District Judge:  The Honorable Louis H. Pollak
_____

ARGUED OCTOBER 4, 2006

BEFORE: McKEE, AMBRO,
and NYGAARD, Circuit Judges.


(Filed January 23, 2008)
_____

Sue A. Unger, Esq. (ARGUED)
Office of the Attorney General of Pennsylvania
21 South 12th Street
Philadelphia, PA 19107

Counsel for Appellants

Witold J. Walczak, Esq. (ARGUED)
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA 15213

John J. Kerrigan, Jr., Esq.
174 Middletown Boulevard
Suite C300
The Lofts at Oxford Valley
Langhorne, PA 19047

Counsel for Appellee

_____

OPINION OF THE COURT

_____


NYGAARD, Circuit Judge.

John Doe, an anonymous plaintiff, sued under 42 U.S.C. § 1983, seeking declaratory and injunctive relief from aspects of Pennsylvania's Registration of Sexual Offenders Act ("Megan's Law"), 42 PA. CONS. STAT. §§ 9791 *et seq*. Pennsylvania's Megan's Law requires all convicted sex offenders to register with state and local police, and subjects certain offenders to community notification. The suit involves the application of these requirements to a Pennsylvania resident who was convicted of a sexual offense in New Jersey, and sought to return to his home state to serve his parole. Under the provisions of Pennsylvania's Megan's Law, any out-of-state sex offender who transfers his supervision to Pennsylvania is subject to community notification. By contrast, an individual who was convicted of the same offense in Pennsylvania would only be subject to community notification if, after a civil hearing, he had been designated a "sexually violent predator due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses." 42 PA. CONS. STAT. § 9792 (2000). The District Court concluded that the disparate treatment of out-of-state offenders violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution. The Commonwealth of Pennsylvania has appealed. We will affirm.

3

I.

We have borrowed liberally from the well-stated factual background section, and the carefully reasoned opinion of Judge Pollak. *See Doe v. McVey et al.*, 381 F.Supp.2d 443, 444-447 (E.D.Pa. 2005). John Doe, a Pennsylvania resident, was arrested for molesting an 11-year-old girl in New Jersey. He pleaded guilty to second degree sexual assault and was sentenced to five years' probation and parole supervision for life. In the sentencing report, the New Jersey judge found that "[d]efendant's sexual deviation is not compulsive nor repetitive and it appears was the result of an intoxicated condition on the evening of the offense" and that Doe was "unlikely to commit another offense."

Ordinarily under New Jersey's Megan's Law, Doe would then have a civil hearing to determine whether his likelihood of recidivism was sufficiently substantial as to warrant his being made a subject of community notification. However, because Doe intended to return to Pennsylvania to complete his sentence, New Jersey did not hold a community notification hearing. At sentencing, Doe requested that his supervision be transferred to Pennsylvania in accordance with the Interstate Compact Concerning Parole and Probation ("the Compact"), 61 PA. STAT. ANN. § 324 (2002), to which both New Jersey and Pennsylvania were signatories.[1] Doe signed an "Application for Compact

---

[1] On June 19, 2002, the Interstate Compact for the Supervision of Parolees and Probationers was repealed and

(continued...)

4

Services and Agreement to Return," consenting to some differences in probationary supervision in the two states.[2] Doe

---

[1] (...continued) replaced by the Interstate Compact for the Supervision of Adult Offenders, which provides for the "controlled movement of adult parolees and probationers across state lines." 61 PA. STAT. ANN.§ 324 (2002); N.J. STAT. ANN. § 168-26 (2002). Both compacts were approved by Congress. *See* 4 U.S.C. § 112 ("The consent of Congress is hereby given to any two or more States to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies, and to establish such agencies, joint or otherwise, as they may deem desirable for making effective such agreements and compacts.").

[2] The Commonwealth raised the issue whether Doe had somehow waived his claim to the process afforded in-state offenders when he applied for a transfer to Pennsylvania by agreeing to comply with the conditions present in Pennsylvania. The record makes clear that Doe was not informed that he would be required to submit to community notification until several months after he applied for the transfer and signed this agreement. "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). The District Court here found no waiver and neither do

(continued...)

was allowed to travel to Pennsylvania pending acceptance of his application to transfer his probation.

Upon receiving Doe's application, the Pennsylvania Board of Probation and Parole held an equivalency hearing in which it determined that, had Doe been convicted in Pennsylvania, he would have been guilty of indecent assault. 18 PA. CONS. STAT. § 3126(a)(7) (2000). Where, as here, the victim is under age thirteen, indecent assault constitutes a misdemeanor in the first degree and is designated a "sexually violent offense." *See* 42 PA. CONS.STAT. §§ 9792, 9795.1(a)(1) (2000).

Doe registered with the Pennsylvania State Police as a sex offender, but refused to consent to community notification without some assessment to determine whether he posed any danger to the community. As a result, the Pennsylvania Board of Probation and Parole denied Doe's application for transfer of probation and informed him that he had to leave the Commonwealth. Doe filed an administrative appeal of that decision, and without awaiting disposition of the administrative

---

[2.](...continued) we. The application for parole transfer refers only to differences in the "supervision" Doe would receive in the two states. It does not make reference to community notification, Megan's Law, or the waiver of any constitutional rights.

6

appeal, filed a Section 1983 action.[3]  Doe alleged that, by treating him differently from in-state offenders, the Board, Board Chairman William F. Ward, and State Police Commissioner Paul Evanko violated his constitutional right to equal protection and due process as well as his statutory rights under the Interstate Compact Concerning Parole.[4]  The Board

---

[3]We are satisfied that Doe has properly brought this action under Section 1983.  For prisoners, the difference between a civil rights action and a collateral attack is easy to describe. Challenges to conditions of confinement fall under § 1983. *Preiser v. Rodriguez*, 411 U.S. 475, 500, (1973). Attacks on the fact or duration of the confinement come under 28 U.S.C.A. § 2254. *Id.*  However, for parolees and probationers, the question of whether a claim should be made under Section 1983 or under federal habeas has been described as a more "metaphysical" one, because the "conditions" of parole are the confinement. *Williams v. Wisconsin*, 336 F.3d 576, 579 (7th Cir. 2003).  Here, Doe is not challenging the actual conditions of his confinement.  Instead, he simply wishes to transfer those conditions placed upon him by the State of New Jersey to the Commonwealth of Pennsylvania. *See Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam) (citing *Preiser*, 411 U.S. at 500). An inmate's challenge to the circumstances of his confinement may be brought under Section 1983.

[4]On September 30, 2004, the District Court entered orders dismissing the Board on Eleventh Amendment grounds

(continued...)

7

has given Doe permission to remain in Pennsylvania pending resolution of his administrative appeal, and has stayed that appeal until his Section 1983 action is final.

The Commonwealth filed a motion for judgment on the pleadings. The District Court denied that motion without prejudice and ordered the parties to submit cross-motions for summary judgment limited to the claim that community notification, as applied to Doe, violated the Interstate Compact. *Doe v. Pa. Bd. of Prob. & Parole*, No. 01-3639, 2002 WL 31548998, 2002 U.S. Dist. Lexis 15067 (E.D.Pa. July 26, 2002). After the parties submitted those motions, the District Court granted the Commonwealth's Motion for Summary Judgment, and invited the parties to re-file their Motions for Judgment on the Pleadings on the constitutional claims in Doe's complaint. *Doe v. Pa. Bd. of Prob. & Parole*, No. 01-3639, 2003 U.S. Dist. Lexis 6795 (E.D.Pa. Mar. 31, 2003).

II.

The District Court had federal question jurisdiction under 28 U.S.C. § 1331. We exercise jurisdiction over this appeal

[4.](...continued)
for lack of jurisdiction, and substituting Acting Board Chairman Benjamin A. Martinez for Chairman Ward and State Police Commissioner Jeffery B. Miller for Commissioner Evanko. By order of July 21, 2005, Board Chair Catherine C. McVey was substituted for former Acting Board Chairman Martinez.

under 28 U.S.C. § 1291. Our standard of review for judgment on the pleadings is plenary. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988)).

III.

Pennsylvania's "Megan's Law" has undergone three distinct enactments. The Act was first passed in 1995. The version of the law being challenged in this appeal was enacted in 2000 and is referred to as "Megan's Law II." A final revision of the law took effect in January of 2005, ("Megan's Law III") and requires that all offenders (both in-state and out-of-state) be listed on the Pennsylvania State Police website as a component of community notification. Pennsylvania's Megan's Law statute sets forth the purpose for registering sexual offenders:

> It is hereby declared to be the intention of the General Assembly to protect the safety and general welfare of the people of this Commonwealth by providing for registration and community notification regarding sexually violent predators who are about to be released from custody and will live in or near their neighborhood.

42 PA. CONS. STAT. ANN. § 9791(b) (2000) (emphasis added). To accomplish this goal, Megan's Law II creates two separate levels of notification: 1) registration with the local law enforcement agencies, and 2) community notification. Doe does not challenge the law's registration provision and indeed, has

registered with the appropriate authorities. This appeal challenges the manner is which the community notification provision is applied to out-of-state offenders.

The community notification provisions apply to in-state offenders who have been adjudicated as "sexually violent predators" and all out-of-state offenders (regardless of their offense and without adjudication) who have transferred their probation to the Commonwealth. 42 PA. CONS. STAT. ANN. § 9798 (2000). The community notification is carried out by the chief law enforcement officer in the particular jurisdiction by disseminating fliers that contain the offender's photo, name, address and some indication that he is a sex offender. These fliers are given to neighbors, school superintendents, school principals, day-care directors and college presidents, charging those individuals with the responsibility of informing individuals whose duties include "supervision of or responsibility for students." 42 PA. CONS. STAT. ANN. § 9798(a) and (b) (2000). A municipality's chief law enforcement officer is to make these fliers available to the general public upon request. 42 PA. CONS. STAT. ANN. § 9798(d) (2000).

Before ordering community notification in the case of an in-state offender, Megan's Law II provides a comprehensive assessment procedure to determine whether the offender is a sexually violent predator. First, the State Sexual Offenders Board evaluates the in-state offender. The Board reviews the nature of the offense, the circumstances surrounding the offense and the offender's character and history. The Board submits a written report containing its assessment to the district attorney. If upon reviewing the Board's assessment, the district attorney

10

believes community notification is warranted, he must file a praecipe with the Court of Common Pleas, request a hearing, and serve the praecipe and the Board's report on defense counsel. An adversarial hearing, with full trial procedures, is held to determine whether the offender is a sexually violent predator. At this hearing, the Commonwealth bears the burden of proving by clear and convincing evidence that the offender is a "sexually violent predator." The offender has a right to be heard, and to call and cross-examine witnesses, including expert witnesses. He has a right to appointed counsel, if he cannot afford a private attorney.

By contrast, all out-of-state offenders who transfer parole to Pennsylvania are subject to the community notification provisions, regardless of their offense of conviction or their potential danger to the community. The statute provides that any "individual ... who is paroled to the Commonwealth pursuant to the interstate compact or the supervision of parolees and probationers shall, in addition to the [registration] requirements..., be subject to the requirements of section 33 of the act ...". 42 PA. CONS. STAT. ANN. § 9795.4(e)(2) (2000). The referenced provision provides that the parolee must "submit to mandatory registration and public notification of all current addresses." 61 PA. STAT. ANN. § 331.33(d)(3) (1941).

Further, 42 Pa. Con. Stat. Ann. § 9798(e) mandates that fliers be state-produced for all out-of-state offenders and given by the local police department to neighbors, day-care centers, school superintendents and various other individuals near the sexual offender's residence. 42 Pa. Cons. Stat. Ann. § 9798(e). Under Megan's Law II, these fliers are only published for in-

11

state individuals who are deemed to be "sexually violent predators." 42 Pa. Cons. Stat. Ann. § 9798(a).

Under this statutory scheme, there is no procedure in which it is determined whether an out-of-state offender poses a danger to the community, thereby triggering the community notification provisions. An in-state offender is given the benefit of an extensive adjudicatory process to determine if he will be subject to community notification. Doe, as an out-of-state offender, was not given a hearing at all. Instead, without judicial decision, or any other determination whatsoever that Doe was a "sexually violent predator," the Commonwealth simply required Doe to submit to community notification.

IV.

As a first inquiry, we must avoid deciding a constitutional question if the case may be disposed of on some other basis. *Spicer v. Hilton*, 618 F.2d 232, 239 (3d Cir. 1980); *see also Kelly v. Railroad Retirement Bd.*, 625 F.2d 486, 495 (3d Cir. 1980) (Sloviter, J., concurring) ("We are constrained to avoid passing upon a constitutional question if the case might be disposed of on statutory grounds and we should not reach to decide a constitutional issue, however intriguing.")

Thus, we begin by examining whether this issue may be resolved under the Interstate Compact for Adult Offender Supervision. Before doing so, however, we need to determine whether we have jurisdiction to undertake such an examination. Put another way, we must decide whether the Compact is a state or federal law.

12

A.

The Parole Compact provides in pertinent part:

Entered into by and among the contracting states, signatories hereto, with the consent of the Congress of the United States of America granted by an act, entitled 'An act granting the consent of Congress to any two or more states to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and for other purposes.'

The contracting states solemnly agree:

(1) That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this compact (herein called the 'sending state') to permit any person, convicted of an offense within such state and placed on probation or released on parole, to reside in any other state party to this compact (herein called 'receiving state') while on probation or parole, if-

(a) Such person is in fact a resident of or has family residing within the receiving state and can obtain employment there.

(b) Though not a resident of the receiving state and not having his family residing there, the

13

receiving state consents to such person being there.

Before granting such permission, opportunity shall be granted to the receiving state to investigate the home and prospective employment of such person.

A resident of the receiving state, within the meaning of this section, is one who has been an actual inhabitant of such state continuously for more than one year prior to his coming to the sending state, and has not resided within the sending state more than six continuous months immediately preceding the commission of the offense for which he has been convicted.

(2) That each receiving state will assume the duties of visitation of, and supervision over, probationers or parolees of any sending state, and, in the exercise of those duties, will be governed by the same standards that prevail for its own probationers and parolees.

61 PA. STAT. ANN. § 321.

We have not, nor has the Supreme Court decided whether the Interstate Parole Compact is federal or a state law. We must now do so because federal courts do not have subject matter jurisdiction to enjoin state officials on the basis of state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89

14

(1984). In *Doe v. Ward,* 124 F.Supp.2d 900 (W.D. Pa. 2000), the District Court held that the Interstate Compact on Probation and Parole is both a state and federal law, explaining:

> [A]n interstate compact is transformed into federal law when 1) it falls within the scope of the Constitution's Compact Clause, 2) it has received congressional consent, and 3) its subject matter is appropriate for congressional legislation. *Cuyler* [*v. Adams* 449 U.S. 433, 442 (1981)] The interstate compact satisfies each of these conditions.
>
> First the need to assert cross-border control of people subject to the jurisdiction of the criminal justice system, whether individuals with detainers or parolees, is a matter that falls within the scope of the Constitution's Compact Clause. Second, the interstate parole compact has received congressional consent. In fact, the legislative source of the congressional consent is the same for both the IAD [Interstate Agreement on Detainers - the subject of *Cuyler*] and the interstate parole compact. Lastly, the subject matter is appropriate for congressional legislation, as the need for interstate cooperation to monitor and control parolees is the same as it is for inmates with detainers.

*Id.* at 911-912. Adopting the reasoning of the District Court in *Ward, supra*, and applying the factors set forth in *Cuyler, supra*,

15

the District Court herein held that the Parole Compact, as a congressionally-sanctioned interstate compact, is federal law as well as state law. We agree.

B.

The first avenue by which we may divert our decision from Constitutional issues, is to see whether a private cause of action (and remedy) exists within the Interstate Compact itself. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979) ("[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person."). The District Court opined that Congress did not intend to create an enforceable federal right under 42 U.S.C. § 1983 for probationers and parolees through the Compact. We agree.

In *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), the Supreme Court took up the question of whether the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g, created an enforceable right under Section 1983. The Court held that an act of Congress must "unambiguously confer" individual rights upon a particular class of beneficiaries for a right of action under Section 1983 to exist. *Gonzaga*, 536 U.S. at 282-283.

To determine whether a statute creates enforceable rights, we consider two indicia of legislative intent. First, we look to statutory text for "rights creating language." *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001). Such language has generally "been the most accurate indicator of the propriety of

16

implication of a cause of action." *Cannon,* 441 U.S. at 690 n.13. Statutory language that is "rights-creating" is explicit in conferring a right directly on a class of persons that includes the plaintiff in a particular case. *Id.; see also Gonzaga*, 536 U.S. 283 (The statute's text must be phrased in terms of the persons benefitted.) (citations omitted). In contrast, general regulatory language or "statutory language customarily found in criminal statutes . . . and other laws enacted for the protection of the general public" provide "far less reason to infer a remedy in favor of individual persons." *Cannon*, 441 U.S. at 693. That is to say, "statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289 (citations omitted).

Absent "rights creating" language, we look to whether the statutory structure evinces an internal enforcement scheme. The Supreme Court advises that, where a statute provides an administrative review process, but does not provide judicial sanctions, the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290; *see also Karahalios v. Nat'l Fed'n of Fed. Employees*, 489 U.S. 527, 533 (1989) ("[I]t is . . . 'an elemental canon' of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies.") (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)).

Because the Compact does not manifest either expressly or indirectly an intent to create a federal right or remedy, we

17

hold that the Compact itself does not create an enforceable right. The language of the Compact itself creates rights for the various states who are signatories to it. It does not create rights for probationers or parolees. Notably, the title under which Congress approved the Compact — "An act granting the consent of Congress to any two or more states to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and for other purposes" — supports our inference that Congress approved the Compact as a means of aiding the states in crime prevention, not as a vehicle to provide procedural rights for probationers and parolees.[5]

At the second point of inquiry, the Probation Compact regulates interactions among the states, delineating one state's rights and responsibilities to another. Regarding the strictures

---

[5] The District Court pointed out that Section 321(7) of the Compact may be perceived as containing "rights-creating" language, but concluded that such a perception is incorrect. Section 321(7) provides that "[t]he duties and obligations hereunder of a renouncing state shall continue as to parolees or probationers residing therein at the time of withdrawal until retaken or finally discharged by the sending state." 61 PA. STAT. ANN. § 321(7). This section's potential rights-creating language does not qualify as the "unambiguous confer[ral]" of rights required under *Gonzaga*. As the learned District Judge observed, "Section (7) is too slender a reed to support the conclusion that the Probation Compact includes the rights-creating language necessary to give rise to an enforceable right under Section 1983." We agree.

18

imposed by one state on probationers from another, the Compact described such requirements as duties that will be "governed by the same standards that prevail for its own probationers and parolees." 61 PA. STAT. ANN. § 321(2) (2002). As was the case in *Sandoval*, the Compact here focuses upon the State entities regulated by the standards, "rather than the individuals protected." *Sandoval*, 532 U.S. at 289. The Compact, we conclude, creates "no implication of an intent to confer rights on a particular class of persons." *Id.*

Lastly, the Compact has no mechanism by which to enforce the alleged "rights" of probationers or parolees. The Compact mentions neither court adjudication nor administrative proceedings. These omissions further lead us to conclude that Congress did not intend to create an enforceable federal right for probationers or parolees under this Compact.

We hold that Doe does not have a private right of action under Section 1983 to enforce the provisions of the Interstate Compact because one cannot be inferred from its terms.

## C.

However, that does not end our contractual inquiry. Interstate compacts are formal agreements between states, and hence, are contracts subject to the principles of contract law.[6]

---

[6.] The authority for states to enter into such agreements with one another arises from the Compact Clause of the United

(continued...)

19

"[A] Compact is, after all, a contract." *Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275, 285, (1959) (Frankfurter, J., dissenting). It remains a legal document that must be construed and applied in accordance with its terms. *Texas v. New Mexico,* 462 U.S. at 564; *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951). Interstate compacts may be considered contracts because of the manner in which they are enacted: there is an offer (the presentation of a reciprocal law to state legislatures), an acceptance (the actual enactment of the law) and consideration (the settlement of a dispute or the creation of a regulatory scheme). *See Aveline v. Pa. Bd. Prob. & Parole,* 729 A.2d 1254, 1257 n.10 (Pa. Commw. Ct.1999).[7]

Although a common law contract directly affects only the rights and obligations of the individual parties to it, an interstate compact may have a direct impact upon the larger population, the economy, and the physical environment in the whole of the

---

[6.](...continued)
States Constitution, Article I, Section 10, Clause 3.

[7.]For a thorough discussion of the history and contractual nature of the Interstate Compact for Adult Offender Supervision, see the website of the Interstate Commission for Adult Offender Supervision, http://www.interstatecompact.org; *see also* Michael L. Buenger and Richard L. *Masters, The Interstate Compact on Adult Offender Supervision: Using Old Tools to Solve New Problems*, 9 ROGER WILLIAMS U. L. REV. 71 (2003).

compact area. Therefore, although Pennsylvania and New Jersey are the obvious parties to the Compact, we must decide whether Doe has any rights under this contract as a third-party beneficiary. This is an issue of first impression.

The Supreme Court has held that an interstate compact is like a contract to the extent that it is "a legal document that must be construed and applied in accordance with its terms," *Texas v. New Mexico*, 482 U.S. 124, 128 (1987). Because a compact is a contract, and must be enforced according to its terms, we do not have authority to provide relief that is inconsistent with its terms. *Texas v. New Mexico*, 462 U.S. 554, 564 (1983). When interpreting an interstate compact, we must address disputes under the compact just as if we were addressing a federal statute or a federal contract. Absent a federal statute making state statutory or common law applicable, federal law controls, and absent federal statutory guidance, the governing rule of decision must be fashioned by the federal court in the mode of the common law. *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 674-679 (1974).

In addition to the parties to a contract, "third-party beneficiaries" of the contract can also enforce its terms. For either Pennsylvania or federal law on third-party beneficiaries we look to the Restatement of Contracts' definition. *See* RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981); *see e.g. Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir.), *cert. denied*, 444 U.S. 980 (1979). Under the Restatement, a third party can claim rights under a contract, even if not stated expressly, if it is consonant with the intention of the contracting parties. Section 302 states as follows:

21

Intended and Incidental Beneficiaries

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intentions of the parties and either

> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (1979).

Thus, we have two tests for determining third-party beneficiary status. The first one requires the parties to indicate in the agreement itself that the third party is a beneficiary. The

second test does not require that the purported beneficiary be adverted to directly in the contract; but, if not, third-party status will be conferred only if circumstances compel us to recognize such a status in order to effectuate the intention of the parties.

The first test offers Doe no relief. The Interstate Compact does not specifically indicate that Doe, or for that matter any parolee, is a third-party beneficiary.[8] Under the second test he fares no better. Here, the "intentions of the parties" must be discerned from the document itself. *Langer v. Monarch Life Ins. Co.* 879 F.2d 75, 81 n.8 (3d Cir. 1989) (citing *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385 (Pa.1986)).

The parties to this Compact have set forth their intentions quite clearly:

> It is the purpose of this compact and the Interstate Commission created hereunder, through means of joint and cooperative action among the compacting states: to provide the framework for the promotion of public safety and protection of the rights of victims through the control and regulation of the interstate movement of offenders in the community; to provide for the effective tracking, supervision, and rehabilitation of these

---

[8.] It is well to note, however, that "the rehabilitation" of the offender is a goal of the Compact. This, however, is too tangential at the current stage of penal science to declare it a "benefit."

23

offenders by the sending and receiving states; and to equitably distribute the costs, benefits and obligations of the compact among the compacting states.

61 PA. STAT ANN. § 324.1 (2002).

The Compact speaks of cooperation between states, protection of the rights of victims, regulation and control of offenders across state borders and the tracking, supervision and rehabilitation of these offenders. In short, no *explicit* third-party obligation appears in the Compact and there is no compelling evidence that, by entering into the Compact, Pennsylvania and New Jersey implicitly intended to give legally enforceable rights to Doe. Doe and similarly situated parolees are not beneficiaries of this Compact; they are merely the subjects of it. Hence, we may now turn to Doe's Constitutional arguments, specifically his assertion that the Commonwealth's disparate treatment of in-state and out-of-state offenders violated his rights to equal protection.

V.

A.

Doe does not challenge the registration requirements of Pennsylvania's Megan's Law. Indeed, he has complied with them since returning to the Commonwealth. He claims only that the law's community notification provisions violate the Equal Protection Clause as they relate to him and other out-of-state offenders. In reviewing a claim that government action violates

24

the Equal Protection Clause, we must first determine the appropriate standard by which we are to review the claim. *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993). If state action does not burden a fundamental Constitutional right or target a suspect class, the "challenged classification must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313 (1993)). If the challenged state action involves a "suspect" classification based on race, alienage or national origin, or infringes on a fundamental constitutional right, we must apply the strict scrutiny standard. *Id.*

The District Court did not decide whether Doe has a fundamental right subject to strict scrutiny, deciding instead that the Commonwealth's disparate treatment could not survive the lower threshold rational basis review. Because we also conclude that the Commonwealth's restrictions would not survive the lower threshold of rational basis review, we likewise do not reach the issue.

B.

If a statute neither burdens a fundamental right nor targets a suspect class, it does not violate equal protection so long as it bears a rational relationship to some legitimate end. *Romer v. Evans*, 517 U.S. 620, 631 (1996). A statute will be considered constitutional under rational basis review if there is "any reasonably conceivable set of facts that could provide a rational basis for" it. *FCC v. Beach Communications*, 508 U.S. 307, 313 (1993). Although this is a low threshold, the Supreme

25

Court has nonetheless instructed that "even in the ordinary equal protection case calling for the most deferential standards, we insist on knowing the relation between the classification adopted and the object to be obtained." *Id.* at 632.

Here, the Commonwealth argues that its interest in public safety is a legitimate concern, and that its practice of treating in-state and out-of-state offenders differently is rationally related to its efforts at alleviating this concern. We readily agree that protecting its citizens from sex offenses committed by repeat offenders is a legitimate state interest. The question, however, is whether the Commonwealth's denial of equivalent process to both in-state and out-of state parolees is rationally related to its security concerns. We conclude it is not.

C.

The Commonwealth offers four rationales to explain how its disparate treatment is rationally related to its public safety goals. First, the Commonwealth argues it is impossible to replicate the legal proceedings it provides in-state offenders for out-of-state offenders. Second, the Commonwealth argues that providing such proceedings to out-of-state offenders would increase time and expense. The Commonwealth next argues that the "harshness" of community notification differs for in-state and out-of-state offenders. Finally, the Commonwealth argues that the publicity given to a sex offender's trial in Pennsylvania rationalizes the disparate treatment of out-of-state offenders whose trials are less likely to receive media attention in the Commonwealth.

D.

Turning to its specific attempts to rationalize the disparate treatment, the Commonwealth first argues that it would be impossible to replicate the process it affords in-state offenders for out-of-state offenders. The Pennsylvania legislature, contrary to this argument, has outlined its responsibilities and obligations under the Interstate Compact, and indeed has statutorily promised to the other signatory states that it would provide Doe, and others similarly situated, with "the same standards that prevail for its own probationers and parolees." 61 PA. STAT. ANN. § 321.

By signing the Interstate Compact, Pennsylvania has agreed that, when accepting out-of-state probationers who transfer their parole and their residence to the Commonwealth, it will approximate the same procedures and standards it applies to its own probationers. There is no evidence on this record that the Commonwealth has *even tried*.

Furthermore, the Commonwealth's assertion that in deciding whether an out-of-state parolee transferee is a sexually violent predator, a Pennsylvania judge would have more evidence about an in-state offender does not hold water. We acknowledge, and Doe concedes, that judges who have presided over an offender's trial will most likely have more *first-hand* information about a particular defendant, his criminal history and other relevant circumstances.

Nonetheless, other avenues of evidence are readily available to the parties. For example, any pre-sentence

investigation and/or recommendation conducted by the transferring state can be made available to the SOAS. Certainly in this digital age court records, transcripts, hearing records and pre-sentence reports can be transmitted interstate electronically. There is no doubt that the Commonwealth can accomplish its goal of ensuring the public safety of its citizens and yet assure out-of-state probationers and parolees procedural rights equivalent to that which it offers in-state offenders.

The Commonwealth's contention is that out-of-state offenders may have benefitted from rehabilitative sexual therapy, thereby placing in-state offenders at a disadvantage, need not detain us long. Under Pennsylvania law, the goal of its community notification program is to identify the sexually violent predator and notify the community where the predator resides. Whether a particular sexual predator has received therapy or treatment is not germane to his identity and location. Indeed, there is no evidence that the fliers used for community notification purposes indicate whether the particular offender has received treatment. The Commonwealth's argument here does not justify the disparate treatment at issue and is not rationally related to its public safety goals.

Interestingly, the difference in the "harshness" of the community notification between in-state and out-of-state offenders is also given by the Commonwealth as a rational reason for its disparate treatment. This contention is not only irrational but illogical. The Commonwealth argues that in-state offenders who are determined to be sexually violent predators are subjected to community notification for life whereas out-of-state offenders are subjected to such notification for the length

28

of their supervision. First, New Jersey has sentenced Doe to lifetime supervision, so the comparison is wholly misplaced. Additionally, as Doe points out, the Commonwealth is comparing the wrong group of offenders. We agree. A comparison of in-state offenders not deemed sexually violent predators and out-of-state offenders reveals that these in-state offenders are excused from community notification whereas all out-of-state offenders are subjected to such notification. Given the opportunity, Doe would argue that he does not meet the statutory definition of a sexually violent predator. He should have that opportunity.

Next, the Commonwealth argues that providing Doe an opportunity to challenge his status as a sexually violent predator would increase costs and time devoted to such a task. That, while possibly true, is wholly irrelevant. The Commonwealth promised to treat all parolees, in-state and out-of-state, the same under the Compact. By agreeing to the dictates of the Interstate Compact, the Commonwealth determined that the burden of additional costs is outweighed by the benefits provided by the Compact. Indeed, one of the stated purposes of the Interstate Compact is to "equitably distribute the costs, benefits and obligations of the Compact among the compacting states." 61 PA. STAT. ANN. § 324.1 (2002). It cannot now argue that concerns about increased costs and expenses are rationally related to its ultimate public safety goals — goals the Interstate Compact seeks to reach through the equitable distribution of costs and expenses.

As a final rationalization for the disparate treatment, the Commonwealth contends that Pennsylvania communities are

29

less likely to have information about a particular offense through media coverage and general public discourse if that offense had been committed outside the state. We conclude, as did the District Court, that this geographic argument is counter-intuitive and meritless. For certain, residents of local communities may have limited — if any — information about an out-of-state sexual offender. However, the same is likely to be true about in-state offenders. This lack of general information is one of the principal reasons Megan's Law was enacted in the first place. Indeed, the crime that inspired the first Megan's Law was committed by a twice-convicted, in-state sexual predator, a fact unknown to his new neighbors. *See Paul P. v. Farmer*, 227 F.3d 98, 99 (3d Cir. 2000) (citing *E.B. v. Verniero*, 119 F.3d 1077, 1097 (3d Cir. 1997). Because any concerns over the public's lack of information about out-of-state sexual offenders applies equally to in-state offenders, the Commonwealth's proffer simply does not rationalize Pennsylvania's disparate treatment of the two groups, nor does it correlate the illegitimate procedural disparity to its legitimate public safety goal.

The Supreme Court has cautioned that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Communications,* 508 U.S. at 307. We undertake no such exercise here. Indeed, we care not. We are only requiring of it, the performance it agreed to. We do not second-guess the actions of the Commonwealth in becoming a signatory to the Interstate Compact — we merely suggest that it must hold to its agreement. There are no exceptions in the Compact to excuse non-performance, or partial performance.

We conclude, that the Commonwealth's approval and participation in the Interstate Compact invalidates any rational connection between the Compact's stated goals and the Commonwealth's disparate treatment of in-state and out-of-state offenders. As a signatory to the Interstate Compact, the Commonwealth has agreed to abide by its terms, and it must. Because the Commonwealth has agreed to adhere to the dictates of the Interstate Compact, it cannot now argue that its reasons for violating the Compact are rational.

Although the Supreme Court has acknowledged that an interstate compact is like a contract to the extent that it is "a legal document that must be construed and applied in accordance with its terms," *Texas v. New Mexico*, 482 U.S. 124, 128 (1987), the Court has also recognized the unique features and functions of such a compact. An interstate compact is one "of two methods under our Constitution of settling controversies between States," *Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275, 279 n. 5 (1959), and it "performs high functions in our federalism," *id.* at 279. *See also* Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution-A Study in Interstate Adjustments*, 34 YALE L.J. 685, 691-95 (1925) (discussing history of Compact Clause). Put another way, an interstate compact represents a political compromise between "constituent elements of the Union," as opposed to a commercial transaction. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 40, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). Such an agreement is made to "address interests and problems that do not coincide nicely either with the national boundaries or with state lines --- interests that may be badly served or not served at all by the ordinary channels of National or State

31

political action." *Id*. (internal quotation marks omitted). Here, the Interstate Compact reflects the collective wisdom not only of the Pennsylvania General Assembly and the New Jersey Legislature, but also that of the other signatory states and the United States Congress as to how best to deal with the interstate movements of adult offenders. It is the stated purpose of the Interstate Compact to "provide the framework for the promotion of public safety and to protect the rights of victims through control and regulation of the interstate movements of offenders in the community." 61 PA. STAT. ANN. § 324.1 (2002)

As we have previously indicated, the Commonwealth requires every out-of-state probationer convicted of a sex offense to submit to community notification under Megan's Law II. 61 PA. STAT. ANN.. § 331.33(d)(3). In Pennsylvania, submission to community notification is a prerequisite to the acceptance of an out-of-state probationer's transfer under the Compact. *Id.* This prerequisite, however, changes the terms of the Compact because it places additional conditions on the transfer of parolees and probationers who otherwise satisfy its other requirements. Having entered into this Compact, the Commonwealth may not unilaterally change its terms. By becoming a signatory to the Compact , Pennsylvania is required to provide Doe with the same process it affords in-state offenders before subjecting him to community notification.

Once New Jersey granted permission for Doe to return to Pennsylvania, Pennsylvania was required to assume supervision over Doe and to treat him the same as in-state offenders. The Commonwealth has not done so and in treating Doe and other out-of-state parolees differently, it violates its own agreement

32

failing to do precisely what it promised: that out-of-state offenders will be "governed by the same standards that prevail for its own probationers and parolees." 61 PA. STAT. ANN. § 321(2).

E.

The Commonwealth's arguments are further undercut by subsequent legislation. While the District Court's decision was pending, the General Assembly amended Megan's Law, effective January 24, 2005 ("Megan's Law III"). This version of the statute altered the statutory scheme governing when out-of-state sex offenders are subjected to community notification fliers within the Commonwealth by amending its registration requirements. Megan's Law III requires registration of individuals convicted of offenses specified in § 9795.1 — which now includes "individuals currently residing in this Commonwealth who have been convicted of [similar sexual offenses] under the laws of . . . another state." 42 PA. CONS. STAT. ANN. § 9795.1 (2005). Because out-of-state offenders are now specifically listed in § 9795.1, they are included in the assessment procedures outlined later in the statute. Section 9797.4 of the statute provides that individuals who were convicted of an offense listed in § 9795.1 (as out-of-state offenders now are), shall, upon court order, be assessed by the board to determine if they should be classified as a sexually violent predator. See 42 PA. CONS. STAT. ANN. §§ 9795.1(a)(3), 9795.1(b)(4); 42 PA. CONS. STAT. ANN. §§ 9795.4(a), (b). This "assessment" procedure makes no distinction between in-state and out-of-state offenders, contemplating only those individuals identified in § 9795.1.

33

Under this provision, various enumerated factors are to be reviewed before a determination is made as to the offender's "sexually violent predator status." These factors include whether the offense involved multiple victims, the nature of the sexual contact with the victim, relationship of the individual to the victim, the age of the victim, the offender's prior offenses and characteristics of the offender such as the offender's age, use of illegal drugs, mental illness and any other mental disabilities or abnormalities. *See* 42 PA. CONS. STAT. ANN. § 9795.4(b)(1)-(4) (2005). Doe — as someone convicted of an offense specified in § 9795.1 — would, upon court order, be provided a hearing, notice, the right to call witnesses, the right to counsel and to the assistance of expert witnesses — all to be conducted before any determination of whether he, as an out-of-state offender, could be classified as a sexually violent offender and be subjected to community notification by police flier. 42 PA. CONS. STAT. ANN. § 9795.4(e).

This essential difference is exactly what Doe seeks. Inexplicably, the Commonwealth argues that what is rational for an out-of-state offender today, cannot be applied to an individual like Doe whose crimes were committed before 2005.

Megan's Law III is further support for Doe's argument that the reasons proffered by the Commonwealth to support its disparate treatment of out-of-state offenders are meritless and, hence, irrational. The Commonwealth argues that it cannot offer full due process for out-of-state offenders. Yet, since January 24, 2005, it has been affording out-of-state offenders the opportunity to challenge their status as sexually violent offenders. It simply is not rational for the Commonwealth to

34

claim it cannot provide equal treatment to out-of-state offenders under Megan's Law II when it is practically doing so under Megan's Law III.[9]

VI.

In summary, we note that Pennsylvania's interest in protecting its citizens from sexually violent predators is certainly compelling. However, subjecting out-of state sex offenders to community notification without providing equivalent procedural safeguards as given to in-state sex offenders is not rationally

---

[9] An undercurrent to our dissenting colleague's argument is that under rational basis review, the government always wins. That, quite simply, cannot be so. In fact, were that the case, our review of issues under this standard would be equivalent to no review at all. A necessary corollary to and implication of rationality as a test is that there will be situations where proffered reasons are not rational. That precise situation is graphically presented here. Put simply, every reason proffered by the Commonwealth for its disparate treatment of Doe in this case is meritless, and hence irrational. No reason the Commonwealth offers for disparate treatment can be considered "rational" because each is contrary to the promises it made to the other signatories when it signed- on to the Compact. Indeed, in the several instances, the stated purposes of the Interstate Compact itself contradict what the Commonwealth claims are its reasons for the disparate treatment it gives to in-state and out-of-state offenders.

related to that goal.   The judgment of the District Court will be affirmed.


AMBRO, Circuit Judge, dissenting

When the Pennsylvania legislature passed Megan's Law II, it decided to require community notification for all out-of-state sex offenders subject to registration who are paroled into the Commonwealth, but to require community notification for in-state sex offenders only if they were deemed to be "sexually violent predator[s]" following a hearing.   Because this legislative decision is reviewed under the rational basis test and because I believe it satisfies that easily met standard, I must respectfully dissent.[10]

I.    **Rational Basis Review Applies**

"The Fourteenth Amendment forbids the States to 'deny to any person within [their] jurisdiction the equal protection of the laws,' but does not prevent the States from making reasonable classifications among such persons." *W. & S. Life*

---

[10.]I have no quarrel with much of the majority's opinion. I agree that Doe has no private right of action under the Interstate Compact on Probation and Parole (the "Compact") and that he is not a third-party beneficiary of the Compact. Thus, as the majority recognizes, the constitutional question under review is properly before us.

36

*Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 656–57 (1981). As the Supreme Court has long recognized, "[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); *see also Romer v. Evans*, 517 U.S. 620, 631 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end."). Conversely, classifications that discriminate against a suspect class or violate an individual's fundamental constitutional rights receive strict scrutiny. *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993). Such fundamental rights include the right to marry, *see, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 12 (1967), the right to custody of one's children, *see, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), the right to vote, *see, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), and the right to interstate travel. *See, e.g.*, *United States v. Guest*, 383 U.S. 745, 757 (1966).

Our first task, therefore, is to ascertain the proper level of constitutional review.[11] *Id.* Doe asserts that the Pennsylvania

---

[11.] While the majority acknowledges that "we must first determine the appropriate standard by which we are to review

(continued...)

statute burdens his fundamental right to interstate travel and that the Commonwealth's classification therefore must satisfy strict scrutiny.[12]  Because Doe's status, first as a probationer and then as an individual subject to parole supervision for life, necessarily limits his constitutional right to travel, I conclude that the Commonwealth's alleged restrictions on that right are subject simply to rational basis review.

The Supreme Court's most recent and comprehensive explanation of the right to interstate travel is found in *Saenz v. Roe*, 526 U.S. 489 (1999).  The Court concluded that this right consists of three components: "[1] the right of a citizen of one State to enter and leave another State, [2] the right to be treated

_____

[11.](...continued) the claim," Maj. Op. at 24, it does not reach this question because it concludes that "the Commonwealth's restrictions would not survive rational basis review."  Maj. Op. at 25.

[12.]Strict scrutiny is only triggered if the Commonwealth's law actually infringes a right to interstate travel.  *See Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 905 (1986) ("[O]nly where a State's law 'operates to penalize those persons . . . who have exercised their constitutional right of interstate migration' is heightened scrutiny triggered.") (quoting *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 258 (1974)).  There is no dispute that Doe has exercised his right to travel.  However, the question remains whether that right is freighted with conditions such that strict scrutiny review does not apply.

as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and [3], for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Id.* at 500.

Doe argues that, because under Megan's Law II all out-of-state sex offenders paroled into Pennsylvania are subject to community notification but in-state sex offenders are only subject to community notification if they are deemed "sexually violent predator[s]" following a hearing, his "right to be treated equally in [his] new State of residence" has been violated. *Id.* at 505. The Commonwealth concedes that Megan's Law II treats differently sex offenders who committed their offenses out of state and are then transferred to Pennsylvania under the Compact and sex offenders who were convicted in the Commonwealth. It argues, however, that Doe's status as a convicted sex offender subject to parole supervision for life necessarily limits his right to interstate travel. I conclude this contention is correct.

In *Jones v. Helms*, 452 U.S. 412 (1981), the Supreme Court recognized that individuals who have committed crimes do not have an unqualified right to interstate travel: "Despite the fundamental nature of this right [to interstate travel], there nonetheless are situations in which a State may prevent a citizen from leaving. Most obvious is the case in which a person has been convicted of a crime . . . ." *Id.* at 419. The Court went on to hold that even if a person is not currently incarcerated for (or

even charged with) a crime, that person's criminal conduct "necessarily qualified his right" to interstate travel. *Id.* at 420–21. Similarly, the Court has pointed out that probationers and parolees "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)); *see also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.").

Our Court likewise has recognized that "conditions of probation include restrictions on a defendant's right to travel." *United States v. Warren*, 186 F.3d 358, 366 (3d Cir. 1999). And the courts of appeals to address directly the right to interstate travel for those on probation or parole have all concluded that the right is either limited or non-existent. *See Williams v. Wisconsin*, 336 F.3d 576, 581 (7th Cir. 2003) ("Like prisoners, . . . parolees . . . have no right to control where they live in the United States; the right to travel is extinguished for the entire balance of their sentences."); *Bagley v. Harvey*, 718 F.2d 921, 924 (9th Cir. 1983) ("[A]n individual's constitutional right to travel, having been legally extinguished by a valid conviction followed by imprisonment, is not revived by the change in status from prisoner to parolee."); *Berrigan v. Sigler*, 499 F.2d 514,

40

522 (D.C. Cir. 1974) (holding that any rights parolees had to travel were necessarily limited because "those rights of necessity are conditioned by the situation in which their convictions placed them").

When Doe initially sought permission to move to Pennsylvania, he was serving a probationary sentence. His sentence of probation ended in 2005, but, pursuant to New Jersey law, as a convicted sex offender Doe's sentence also included "a special sentence of parole supervision for life." N.J. STAT. ANN. § 2C:43-6.4. Under the statute, "[p]ersons serving a special sentence of parole supervision for life remain in the legal custody of the Commissioner of Corrections, shall be supervised by the Division of Parole of the State Parole Board, . . . and shall be subject to conditions appropriate to protect the public . . . ." *Id.*

Doe's status as a probationer at the time he filed his suit, and as subject to lifelong supervised parole now, necessarily means that he was not, and is not now or ever, entitled to the full panoply of constitutional rights enjoyed by the average citizen. Doe contends that the cases recognizing the limits on parolees' and probationers' right to interstate travel do not apply because they do not involve the third component of the right to travel recognized by *Saenz* – the right of those who elect to become permanent residents to be treated like other citizens. But Doe offers no reasons why this distinction matters, and I know of none. His status as a convicted sex offender on parole

41

necessarily places restrictions not only on his freedom of movement but also on other rights of citizenship.[13] Because Megan's Law II applies the allegedly discriminatory requirement only to out-of-state sex offenders whose rights to travel have been reduced by probation or parole,[14] it is less likely to be constitutionally suspect, obviating the need for strict scrutiny.

---

[13.] For example, the Supreme Court has held that states may, consistent with the Equal Protection Clause, deprive convicted felons of the right to vote even after they have completed their sentences and paroles. *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974).

[14.] While Doe contends that Megan's Law II discriminates between in- and out-of-state sex offenders, in fact the community notification requirement only applies to out-of-state sex offenders who are transferred to Pennsylvania *while on probation or parole*. *See* 42 PA. CONS. STAT. ANN. § 9795.2(b)(3) (2004) ("An individual subject to registration under this subsection *who is paroled to the Commonwealth pursuant to the interstate compact for supervision of parolees and probationers* shall, in addition to the requirements of this subchapter, be subject to [community notification].") (emphasis added), *repealed by* 2004, Nov. 24, P.L. 1243, No. 152 § 8, effective Jan. 24, 2005. If a sex offender convicted in another state is no longer subject to parole supervision in that state and then moves to Pennsylvania, that individual, while still subject to registration requirements, would not be subject to the community notification requirement that Doe challenges here.

For this reason, although never directly addressed by the Supreme Court or our Court, it appears uncontroversial that someone who has been convicted of a sexual offense and who continues to be subject to parole supervision has forfeited some portion of his constitutional right to interstate travel—including the right to be treated the same as the in-state sexual offenders of the state in which he wishes to make his new home. Because Doe as a probationer or parolee is not entitled to an unqualified right to interstate travel, I conclude that restrictions on his exercise of that right should be subject to rational basis review. In other words, I would inquire whether the different treatment of him and similarly situated sex-offenders who are citizens of Pennsylvania is rationally related to a legitimate state purpose.

## II.     The Rational Basis Test is Satisfied

As our Court has observed, the rational basis test is a "very deferential standard." *English v. Bd. of Educ. of Boonton*, 301 F.3d 69, 82 (3d Cir. 2002). "Under rational basis review, 'a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *United States v. Walker*, 473 F.3d 71, 77 (3d Cir. 2007) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). "A statute is presumed constitutional, and '[t]he burden is on the one attacking the legislative arrangement to [negate] every conceivable basis which might support it.'" *Heller*, 509 U.S. at 320 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364

43

(1973)) (internal citations omitted). Thus, equal protection principles are met so long as a plausible policy reason explains the classification and the relationship of the classification to its policy goal is not so weak as to suggest that the distinction is arbitrary or irrational. *Walker*, 473 F.3d at 77 (citing *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 107 (2003)). In this context, "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *see also Dukes*, 427 U.S. at 303 ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations . . . ."). "The threshold for upholding distinctions in a statute under rational basis review is extremely low, and it is not within the purview of the courts to conduct anything but a limited review of the reasons that legislation subject to rational-basis review classifies among similarly situated persons." *United States v. Pollard*, 326 F.3d 397, 408 (3d Cir. 2003). "[E]ven if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous," *Romer*, 517 U.S. at 632, "[w]here there are 'plausible reasons' for [the legislature's] action, 'our inquiry is at an end,'" *Beach Commc'ns, Inc.*, 508 U.S. at 313-14 (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).

"Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the

44

legislature." *Id.* at 315. In addition, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* "Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321.

What this means in practice is that "[a] classification does not fail rational-basis review because it 'is not made with mathematical nicety or because . . . it results in some inequality.'" *Id.* (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)); *see also Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69–70 (1913) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.").

I believe that Megan's Law II passes the rational basis test.[15] As the majority acknowledges and our Court has held, the

---

[15.] The majority reads my analysis as having an "undercurrent" implying that "under rational basis review, the government always wins." Maj. Op. 35 n.9. I do not suggest that "our review of issues under this standard [is] equivalent to no review at all." *Id.* The Supreme Court has struck down statutes under this standard of review. *See, e.g.*, *Romer*, 517 U.S. 620 (striking down amendment to Colorado constitution barring the enactment of laws prohibiting discrimination on the
(continued...)

45

Commonwealth unquestionably has a legitimate interest in protecting its citizens from sexual offenses. Maj. Op. at 26, 35; *Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996) ("Protecting vulnerable individuals from sexual offenses is certainly a legitimate state interest."). It is not necessary to "explore all the reasons that the State advances in justification" of the different treatment, so long as any one of them provides a rational basis for the distinction. *Dandridge*, 397 U.S. at 486.

Here, at least two of the Commonwealth's justifications demonstrate that the different treatment of out-of-state sex-offenders is rationally related to its interest in protecting its citizens from sexual offenses. First, the Commonwealth argues that it would not be able to replicate adequately the proceedings that in-state offenders receive prior to community notification for out-of-state offenders and that the use of inadequate proceedings would not provide the level of protection it desires. Specifically, the Commonwealth notes that the hearings for in-state offenders take place close to the time of sentencing and are usually conducted by the same judge who presided over the

[15.](...continued)
basis of sexual orientation); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) (striking down zoning ordinance excluding homes for mentally disabled). However, the results of those cases stem from an arbitrariness and irrationality absent here. I certainly would not hesitate to join the majority had Pennsylvania's law suffered from similar inadequacies.

46

offender's trial. Any hearing that would be conducted for an out-of-state offender would necessarily be conducted by a judge who is unfamiliar with the offender and nearly always would take place at a time further removed from the conviction, increasing the likelihood that, as a general matter, there would be less relevant information available in an out-of-state offender's hearing than in an in-state offenders' hearing. This would make the results of out-of-state offenders' hearings generally less reliable than those for in-state offenders. Such reasoning is rational.

The majority faults it, however, insisting that "in this digital age court records, transcripts, hearing records and pre-sentence reports can be transmitted interstate electronically." Maj. Op. at 27. Even if the majority is correct that all the relevant information is readily available, which seems doubtful, this mistakes our judicial role. Under rational basis review, we do not pass on the "wisdom, fairness, or [even] logic" of legislative decisionmaking. *Beach Commc'ns, Inc.*, 508 U.S. at 313; *see also Dandridge*, 397 U.S. at 486 ("[T]he Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy."). As long as there is "any reasonably conceivable state of facts that could provide a rational basis for the classification," we must uphold the statute against an equal protection challenge. *Walker*, 473 F.3d at 77. If the "question is at least debatable," the Commonwealth's classification survives rational basis review. *Minnesota v. Clover Leaf*

47

*Creamery, Co.*, 449 U.S. 456, 464 (1981). Because it is debatable whether appropriate records may be obtained as readily from the courts of another state as from within the Pennsylvania court system, Megan's Law II survives rational basis review.

A second rational basis for the different treatment can be found in the Commonwealth's argument that Pennsylvania communities are likely to know more about in-state offenders than out-of-state offenders because of local media coverage. The majority calls this reasoning "counter-intuitive and meritless." Maj. Op. 29. I disagree. It is not irrational to think that, on the whole, Pennsylvania communities are more likely to be aware of in-state sexual offenders than out-of-state offenders. It may be true that residents of Philadelphia likely would know more from local media coverage about a sex offender in Camden, New Jersey than in Pittsburgh, and it may be true that many (or even most) sex offenders, both in-state and out-of-state, receive no publicity at all. However, when the legislature made a distinction between in-state and out-of-state offenders, "[e]ven if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by [the legislature] imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required.'" *Vance v. Bradley*, 440 U.S. 93, 108 (1979) (quoting *Phillips Chem. Co. v. Dumas Sch. Dist.*, 361 U.S. 376, 385 (1960)).

The majority is correct that the driving force behind the enactment here was a lack of available information about sex offenders, but this does not mean Pennsylvania must forgo deciding that, in the case of out-of-state sex offenders paroled into the Commonwealth, it is going to demand the greater protection afforded by community notification. The Pennsylvania legislature could have rationally believed that overall there is likely to be a greater lack of public information for out-of-state offenders than for in-state offenders. This is sufficient to survive rational basis review.

My colleagues also suggest that two global concerns undermine the specific reasoning discussed above. First, they conclude that "the Commonwealth's approval and participation in the Interstate Compact invalidates any rational connection between the Compact's stated goals and the Commonwealth's disparate treatment of in-state and out-of-state offenders." Maj. Op. 30. They claim that they do not second-guess the Commonwealth's decision to join the Compact. *Id*. Instead, they "merely suggest that [the Commonwealth] must hold to its agreement." *Id*. But how is this relevant to our equal protection analysis? We agree that Doe does not have a private right of action under the Compact. The Equal Protection Clause should not be construed to allow him a *de facto* right of action. Any alleged violation of the Compact is not properly before us and it is inappropriate for us to try to enforce it via the Equal Protection Clause.

49

Second, the majority reasons that the "Commonwealth's arguments are further undercut by subsequent legislation." *Id.* at 33. Megan's Law III indeed may improve upon the former legislation.[16] However, our rational basis inquiry does not require us to invalidate legislation that can be improved or that has been improved. Accordingly, I am unpersuaded that Megan's Law II should be invalidated under rational basis review.[17]

\* \* \* \* \*

---

[16.]Megan's Law III, 2004 Nov. 24, P.L. 1243, No. 152, § 7, established new rules and procedures for out-of-state offenders, which Doe describes as bringing Pennsylvania closer to other jurisdictions. Doe explains that they subject transferring probationers and parolees to community notification if the offender would have been subject to community notification in the state in which parole or probation was imposed. Because these new rules are not at issue in this appeal, we need not consider how Doe would be treated under them.

[17.] Because the District Court did not reach Doe's due process claim, I would remand for that Court to address the issue in the first instance. *Berda v. CBS Inc.*, 881 F.2d 20, 28 (3d Cir. 1989) ("Generally, in the absence of 'exceptional circumstances,' we decline to 'consider an issue not passed upon below.'").

I believe that Megan's Law II passes the rational basis test, the standard we apply. Because I believe the majority misapplies that test, apparently concluding that there is no conceivable set of facts that the Pennsylvania legislature could have rationally believed to justify the different treatment here, I respectfully dissent.