# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | I.D. Nos. 1906017002 |
| | ) | & 1906016532 |
| JUSTIN M. TOPOLSKI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Submitted: March 16, 2023
Decided: June 27, 2023
Corrected: June 28, 2023

## OPINION

*Upon Defendant's Motion for a Writ of Habeas Corpus*

**DEFENDANT IS ENTITLED TO RELIEF—SUPPLEMENTAL BRIEFING ORDERED REGARDING APPROPRIATE RELIEF**

Stephen Welch, Jr., Deputy Attorney General, Department of Justice, Dover, Delaware, *for the State.*

John R. Garey, Esquire, John R. Garey, PA, Dover, Delaware, *for Defendant.*

**Primos, J**.

## INTRODUCTION

Defendant Justin Topolski (hereinafter "Mr. Topolski") has been in state custody for over four years, i.e., since June 25, 2019.[1] For most of that time, he has been held at the Delaware Psychiatric Center (hereinafter the "DPC") pending efforts to restore his competency to stand trial. For the reasons set forth in the Court's Memorandum Opinion and Order dated February 7, 2023, it appears unlikely that he will become competent to stand trial in the foreseeable future, if ever.[2] The question now before this Court is whether Mr. Topolski's continued detention is authorized by Delaware law, and if so, whether such detention is consistent with the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, as interpreted by the U.S. Supreme Court in *Jackson v. Indiana*.[3] For the reasons that follow, the Court concludes that Mr. Topolski's continued detention is authorized by Delaware statute until the Court "is satisfied that the public safety will not be endangered" by his release.[4] Nevertheless, indefinite detention under that standard violates Mr. Topolski's right to equal protection of the law by denying him the procedural protections, and burden-of-proof benefits, of a civil commitment proceeding. **Having found this continued detention unconstitutional, the Court requires expedited supplemental briefing on the next procedural steps to bring about Mr. Topolski's release from custody.**

---

[1] Def.'s Suppl. Br. at 1.
[2] *State v. Topolski*, 2023 WL 1816351, at *9 (Del. Super. Feb. 7, 2023).
[3] 406 U.S. 715 (1972).
[4] 11 *Del. C.* § 403(b).

## BACKGROUND

### I. Statutory Background

In 1972, as part of a broader revision to the Delaware criminal code, the General Assembly enacted the original versions of the statutory provisions governing Mr. Topolski's commitment—11 *Del. C.* §§ 403 and 404. In its initial form, 11 *Del. C.* § 403 applied only to people found not guilty by reason of insanity (hereinafter "insanity acquittees"). It provided that upon such acquittal, an insanity acquittee "shall forthwith be committed to the Delaware State Hospital" and kept there "until the Superior Court of the county wherein the case was tried is satisfied that the public safety will not be endangered by his release."[5]

At the same time, the General Assembly enacted the original 11 *Del. C.* § 404 to govern pre-trial procedure for criminal defendants who are found incompetent to stand trial.[6] It provided that "the Court may order the accused person to be confined and treated in the Delaware State Hospital until he is capable of standing trail [sic]."[7] However, the legislature enacted one mechanism for an accused to avoid continued detention absent restoration to competency—the defendant could move the Court to "conduct a hearing to determine whether the State can make out a prima facie case against the defendant, and if the State fails to present sufficient evidence to constitute a prima facie case, the Court shall dismiss the charge."[8]

Just under a month before the General Assembly enacted these provisions, the U.S. Supreme Court decided a constitutional challenge to the indefinite pre-trial commitment of an incompetent defendant in *Jackson v. Indiana*.[9] The Indiana

---

[5] 58 Del. Laws ch. 497, § 1 (1972) (enacting 11 *Del. C.* § 403).
[6] *Id.* (enacting 11 *Del. C.* § 404).
[7] *Id.*
[8] *Id.* "Prima facie case" was defined to mean "some credible evidence tending to prove the existence of each element of the offense." *Id.* (enacting 11 *Del. C.* § 301).
[9] 406 U.S. 715 (1972).

3

statute at issue permitted the state to hold a defendant in custody indefinitely solely on the basis of his incompetency to stand trial, even though that defendant had been found to have very dim prospects of competency restoration.[10] The Supreme Court found both an equal protection and a due process violation, holding that "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."[11] Otherwise, "the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant."[12] Most states have since updated their statutes or court rules authorizing detention of incompetent defendants to institute time limits for detention, periodic review of the individual's prognosis for competency restoration, or other limiting features consistent with the holding in *Jackson*.[13]

---

[10] *Id.* at 718–19.

[11] *Id.* at 738.

[12] *Id.*

[13] *See* Nicholas Rosinia, Note*, How 'Reasonable' Has Become Unreasonable: A Proposal for Rewriting the Lasting Legacy of Jackson v. Indiana*, 89 Wash. U.L. Rev. 673, 681–91 (2012) (discussing and categorizing different states' responses to *Jackson*); *see also*, *e.g.*, *State v. Rotherham*, 923 P.2d 1131, 1138 (N.M. 1996) ("After *Jackson* was decided, New Mexico revised its statutes governing the confinement and treatment of persons found to be incompetent to stand trial. . . . If the court determines the defendant is still incompetent and is not making progress toward competency such that there is no substantial probability he will attain competency within one year, the court may either release defendant and dismiss the case with prejudice, Section 31–9–1.4(B), dismiss the case with prejudice and refer the defendant to the district attorney for civil commitment under the MHDDC, Section 31–9–1.4(C), or pursue criminal commitment, Section 31–9–1.4(A)."); *In re Snyder*, 422 P.3d 1152, 1157 (Kan. 2018) ("But soon after *Jackson*, the Legislature revamped the competency statutes in an apparent effort to comply with that decision. To this end, the Legislature imposed statutory deadlines that serve as benchmarks to determine whether a reasonable time to restore a defendant's competency under *Jackson* has expired." (internal citations omitted)).

In 1979, an insanity acquittee challenged his commitment under 11 *Del. C.* § 403, citing *Jackson* to argue that such commitment, without the procedural steps required by Delaware's generally applicable civil commitment statute, violated his right to equal protection.[14] The Delaware Supreme Court rejected this argument, explaining that

> insanity acquitees have performed acts which, but for the existence of a mental disease or defect that [sic] the time of the acts, would otherwise have subjected them to criminal sanctions. These past criminal acts are sufficient to justify the procedural differences in initial commitment between the two groups.[15]

Moreover, the Delaware Supreme Court rejected the analogy to *Jackson*, noting that the U.S. Supreme Court had not addressed "the constitutional validity of procedures for initial commitment of an insanity acquitee."[16] In addition to upholding the acquittee's initial commitment, the court found no equal protection violation in denying insanity acquittees the same "administrative release procedure" afforded to people civilly committed to the Delaware State Hospital.[17]

In 1985, several years after *Lewis* was decided, the General Assembly amended 11 *Del. C.* § 403(b) by adding a cross-reference to Section 404 (among other provisions).[18] As a result of the cross-reference, Section 403's standard of release applies to incompetent defendants confined at the DPC, providing a potential avenue for release separate from the prima facie hearing provided under Section 404(a). To the Court's knowledge, for reasons unknown, no release hearing has ever

---

[14] *In re Lewis*, 403 A.2d 1115, 1117–18 (Del. 1979).

[15] *Id.* at 1118.

[16] *Id.*

[17] *Id.* at 1120.

[18] 65 Del. Laws ch. 90, § 1 (1985). The amended Section 403 also cross-references Section 405 (defendants becoming incompetent after conviction but before sentencing), Section 406 (prisoners developing mental illness), and Section 408 (defendants found guilty but mentally ill).

been held pursuant to Section 403 to test the appropriateness of continued confinement of an incompetent defendant.

In operation, Sections 403 and 404 have remained largely the same since 1985. Thus, at present, Section 404(a) provides that an incompetent criminal defendant may "be confined and treated in the Delaware Psychiatric Center until the accused person is capable of standing trial."[19] Upon the defendant's motion, the court may conduct a hearing "to determine whether the State can make out a prima facie case against the defendant, and if the State fails to present sufficient evidence to constitute a prima facie case, the court shall dismiss the charge."[20] Otherwise, an incompetent person remains at the DPC unless eligible for release pursuant to Section 403(b), i.e., unless the Court "is satisfied that the public safety will not be endangered by the patient's release."[21] Despite the holding in *Jackson*, both statutes

---

[19] 11 *Del. C.* § 404(a). The subsection provides in full that:

> Whenever the court is satisfied, after hearing, that an accused person, because of mental illness or serious mental disorder, is unable to understand the nature of the proceedings against the accused, or to give evidence in the accused's own defense or to instruct counsel on the accused's own behalf, the court may order the accused person to be confined and treated in the Delaware Psychiatric Center until the accused person is capable of standing trial. However, upon motion of the defendant, the court may conduct a hearing to determine whether the State can make out a prima facie case against the defendant, and if the State fails to present sufficient evidence to constitute a prima facie case, the court shall dismiss the charge. This dismissal shall have the same effect as a judgment of acquittal.

[20] *Id.*

[21] *Id.* § 403(b). The subsection provides in full that:

> Except as provided in subsection (c) of this section below, a person committed, confined or transferred to the Delaware Psychiatric Center in accordance with subsection (a) of this section, § 404, § 405, § 406 or § 408 of this title (referred to herein as "the patient") shall be kept there at all times in a secured building until the Superior Court of the county wherein the case would be tried or was tried is satisfied that the public safety will not be endangered by the patient's release. The Superior Court shall without special motion reconsider the necessity of continued detention of a patient thus committed after the patient has been detained for 1 year. The Court shall thereafter reconsider the patient's detention upon petition on the patient's behalf or whenever advised by the Psychiatric Center that the public safety will not be endangered by the patient's release.

remain silent regarding defendants who appear unlikely to be restored to competency in the foreseeable future.

## II.    Civil Commitment in Delaware

Like most states, Delaware provides a mechanism for the involuntary commitment of mentally ill individuals who pose a danger to themselves or to others, without the involvement of the criminal justice system. The requirements and procedure for civil commitment are set forth in 16 *Del. C.* ch. 50. Specifically, 16 *Del. C.* § 5011 requires the State to prove by clear and convincing evidence that (1) the individual is a person with a "mental condition";[22] (2) based upon manifest indications, the individual is "dangerous to self" or "dangerous to others"; (3) any less restrictive alternatives "have been considered and determined to be clinically inappropriate"; and (4) the individual "has declined voluntarily inpatient treatment, or lacks the capacity to knowingly and voluntarily consent to inpatient treatment."[23] A person is considered "dangerous to others" when "by reason of mental condition there is a substantial likelihood that the person will inflict serious bodily harm upon another person within the immediate future."[24] "Serious bodily harm" is defined as "physical injury which creates a substantial risk of death, significant and prolonged disfigurement, significant impairment of health, or significant impairment of the function of any bodily organ."[25]

---

[22] "Mental condition" is defined as "a current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, capacity to control behavior, or capacity to recognize reality." 16 *Del. C.* § 5001(13).

[23] *Id.* § 5011(a). In addition to the statutory requirement, proof by clear and convincing evidence in a typical civil commitment proceeding is a constitutional requirement. *See Addington v. Texas*, 441 U.S. 418, 433 (1979).

[24] 16 *Del. C.* § 5001(3). "Dangerous to self" means that "by reason of mental condition there is a substantial likelihood that the person will imminently sustain serious bodily harm to oneself." *Id.* § 5001(4). Both of these determinations "shall take into account a person's history, recent behavior, and any recent act or threat." *Id.* § 5001(3) and (4).

[25] *Id.* § 5001(17).

A person involuntarily committed is entitled to written notice, a judicial hearing, representation by counsel, discovery, a full record of the proceedings, and a right to appeal.[26]   A court order for involuntary commitment cannot exceed three months, at which point a new hearing with all the same procedural protections is required in order to justify continued commitment.[27]   Moreover, whenever "the hospital determines that the involuntary patient no longer meets the criteria for provisional admission or involuntary inpatient commitment, the hospital shall so certify in writing and immediately discharge the person and advise the court of its determination and the discharge."[28]   In other words, the DPC staff may discharge an involuntary civil committee based on their professional judgment, without further court involvement.[29]

## III.   Commitment Under Section 403

On its face, the operative phrase "the public safety will not be endangered by the patient's release" sheds little light on the substantive standard for release under Section 403.   Case law construing this provision in the not-guilty-by-reason-of-insanity context, however, clarifies the meaning of this standard.

First, the Delaware Supreme Court in *Lewis* looked to the definitions in the involuntary commitment statute for guidance in construing the public safety standard.[30]   At the time, the court construed the phrase to mean "that such person is (not) likely to commit . . . serious harm to . . . others or to property . . . ."[31]   The civil commitment statute has since been amended, however, and the definition on which the *Lewis* court relied is no longer included.   In light of that change, this Court

---

[26] *Id.* § 5007.
[27] *Id.* § 5011(c) and (d).
[28] *Id.* § 5010.
[29] This is similar to the administrative release procedure addressed by the Delaware Supreme Court in *Lewis*.  *See supra* note 17 and accompanying text.
[30] *Lewis*, 403 A.2d at 1121.
[31] *Id.* (alterations in original).

8

concludes that the release standard should be construed with respect to the current definition of "dangerous to others" found in 16 *Del. C.* § 5001(3). In other words, a person confined to the DPC pursuant to Section 403 shall be kept there until the Court is satisfied that there is not "a substantial likelihood that the person will inflict serious bodily harm upon another person within the immediate future" by reason of the person's mental condition.

*Lewis* also held that "the danger referred to must be construed to relate to mental illness" because "dangerousness without mental illness could not be a valid basis for indeterminate confinement in the State Hospital."[32] Two decisions of this Court are instructive in this regard. First, *State v. Tarbutton* held that the dangerousness justifying the person's detention "must arise from factors directly related to the mental illness for which the insanity acquittee was initially confined."[33] Second, *State v. Witherup* addressed the critical issue of burden of proof, holding that an insanity acquittee seeking release under Section 403 "bears the burden of proving 'by a preponderance of the evidence freedom from such mental illness and dangerous propensities.'"[34]

Finally, as to the timing of the hearing, the Court is required to "reconsider the necessity of continued detention of a patient thus committed after the patient has been detained for 1 year."[35] After that, the Court shall "reconsider the patient's detention upon petition on the patient's behalf or whenever advised by the Psychiatric Center that the public safety will not be endangered by the patient's release."[36]

---

[32] *Id.* (quoting *Mills v. State*, 256 A.2d 752, 757 n.4 (Del. 1969)).
[33] 407 A.2d 538, 542 (Del. Super. 1979).
[34] 1996 WL 527284, at *3 (Del. Super. July 3, 1996) (quoting *Mills*, 256 A.2d at 758).
[35] 11 *Del. C.* § 403(b).
[36] *Id.*

## IV. Factual and Procedural History

The Court and the parties are well acquainted with the facts of this case, and the Court incorporates by reference the Factual and Procedural Background in its previous Memorandum Opinion and Order.[37] As pertinent here, Mr. Topolski stands charged with nine separate criminal counts, including attempted murder in the first degree, stemming from an incident in 2019 during which he allegedly pushed his mother to the ground while holding a knife, threatened to cut her head off, and fired a rifle in the direction of responding officers, striking their vehicle. In May of 2021, the Court held a competency hearing and later found Mr. Topolski incompetent to stand trial due in large part to his delusional beliefs about the facts underlying the charges. At an evidentiary hearing held on September 15, 2022, the Court held that the State had established a prima facie case for each charge against Mr. Topolski. Mr. Topolski remains committed to the DPC pursuant to 11 *Del. C.* § 404(a).

On September 27, 2022, Mr. Topolski filed a motion for a writ of habeas corpus on equal protection and due process grounds.[38] The State filed a response on December 5, 2022, and Mr. Topolski filed a reply on December 19, 2022. The Court issued a Memorandum Opinion and Order on February 7, 2023, concluding that "there is not a substantial probability that Mr. Topolski will attain competency in the foreseeable future, and a reasonable period of time to so determine has expired."[39] Under *Jackson v. Indiana*, this ruling means that Mr. Topolski may no longer be held solely on account of pending criminal charges and his incompetency to stand

---

[37] *Topolski*, 2023 WL 1816351, at *1–3.

[38] Mr. Topolski also moved for dismissal of the charges against him on speedy trial grounds. The Court denied this motion without prejudice for the reasons previously stated in its Memorandum Opinion and Order. *See id.* at *4–6.

[39] *Id.* at *9. A supplemental report filed by the DPC on May 3, 2023, indicates that Mr. Topolski's prognosis has not improved and that he has become generally uncooperative with competency restoration efforts.

trial.[40] However, the Court deferred decision on Mr. Topolski's habeas petition and ordered supplemental briefing on whether the continued detention of Mr. Topolski is constitutional in light of the release procedure available to him in 11 *Del. C.* § 403(b). Mr. Topolski and the State filed their supplemental briefs on February 27, 2023, and February 28, 2023, respectively. Mr. Topolski filed a response to the State's supplemental brief on March 9, 2023, and the matter was submitted for decision on March 16, 2023.[41]

## LEGAL PRINCIPLES

Mr. Topolski raises his constitutional arguments via a petition for a writ of habeas corpus.[42] On a petition for a writ of habeas corpus,[43] the Court's review is typically limited to ascertaining "the jurisdiction of the court ordering the commitment" and whether the commitment is "valid on its face."[44] However, "there must be an adequate procedure to give a person deprived of his freedom the opportunity to have the intrinsic fairness of the criminal process under which he is committed examined into, even though it appears proper and regular on its face."[45]

---

[40] *Topolski*, 2023 WL 1816351, at *9 ("[Mr. Topolski] can no longer be held solely on the basis of his criminal charges, and incompetency to be tried for them, consistent with the Due Process Clause.").

[41] The State filed a letter on this date to notify the Court that it was waiving the opportunity to respond to Mr. Topolski's last submission and that it intended to rest on its earlier submissions.

[42] Although filed and briefed on the criminal docket, a habeas proceeding is civil in nature. *See In re Dean*, 251 A.2d 347, 349 (Del. 1969) ("Even when a petition is filed by a prisoner, the proceeding remains civil in nature; it does not change character by reason of the status of the petitioner. The purpose of the writ is not to determine guilt or innocence but the legality of the detention.").

[43] The Superior Court's statutory authority to grant writs of habeas corpus is codified at 10 *Del. C.* §§ 6901–6918. The Court notes that the State has not challenged Mr. Topolski's right to raise his constitutional arguments via a habeas petition. In addition, the Court notes that a patient involuntarily committed to the DPC pursuant to 16 *Del. C.* ch. 50 is explicitly authorized to challenge continued confinement or the legality of the patient's commitment proceedings via habeas petition. 16 *Del. C.* § 5014(b).

[44] *In re Pitt*, 541 A.2d 554, 557 (Del. 1988).

[45] *Id.*; *Curran v. Woolley*, 104 A.2d 771, 774 (Del. 1954).

11

Thus, the question before the Court is whether the statutory remedy provided by Section 403(b) is constitutionally adequate to test the legality of Mr. Topolski's continued detention.[46]

"Enactments of the Delaware General Assembly are presumed to be constitutional."[47] The party challenging the constitutionality of a statute bears the high burden of rebutting that presumption,[48] and "[a]ll reasonable doubts as to the validity of a law must be resolved in favor of the constitutionality of the legislation."[49] A corollary to this presumption is the requirement that, when interpreting a statute, the Court "should strive to construe the legislative intent so as to avoid unnecessary constitutional infirmities."[50] Nevertheless, "when such a construction discerns a conflict between the Constitution and a statute, the Constitution will prevail."[51]

## ANALYSIS

The question before the Court is whether an incompetent criminal defendant, against whom the State has made out a prima facie case, but who is unlikely to be restored to competency in the foreseeable future, may be confined at the DPC until the Court is satisfied that the defendant's release would not endanger public safety.

---

[46] *See Mills v. State*, 256 A.2d 752, 758 (Del. 1969) ("A writ of habeas corpus is not available to the appellant because, as we have held, his commitment under s 4702(a) was valid; and because the statutory remedy provided by s 4702(c), as herein construed, is adequate and available to the appellant to test the legality of his continued detention." (citing *Curran*)).

[47] *Hoover v. State*, 958 A.2d 816, 821 (Del. 2008); *see also Sierra v. Dep't of Servs. for Children, Youth & their Families*, 238 A.3d 142, 155–56 (Del. 2020) (explaining that Delaware courts "presume statutes are constitutional unless there is clear and convincing evidence of unconstitutionality"); *Justice v. Gatchell*, 325 A.2d 97, 102 (Del. 1974) (explaining that Delaware courts should be "mindful of the traditional self-restraint" when "engaged in testing the constitutionality of an act of the General Assembly").

[48] *Gatchell*, 325 A.2d at 102 ("One who challenges the constitutionality of a statute has the burden of overcoming the presumption of its validity.").

[49] *McDade v. State*, 693 A.2d 1062, 1065 (Del. 1997).

[50] *Terex Corp. v. S. Track & Pump, Inc.*, 117 A.3d 537, 549 (Del. 2015) (quoting *Richardson v. Wile*, 535 A.2d 1346, 1350 (Del. 1988)).

[51] *Albence v. Higgin*, 2022 WL 17591864, at *19 (Del. Dec. 13, 2022).

While several Delaware decisions have addressed *Jackson*'s implications for long-term or indefinite confinement under Section 404, none have addressed Section 403 and dangerousness as an alternative basis for confinement.[52] Thus, this is a question of first impression in Delaware.[53] Mr. Topolski argues first that 11 *Del. C.* §§ 403(b) and 404(a) no longer authorize his detention given the Court's previous ruling that he is unlikely to be restored to competency. Second, he argues that Delaware's commitment statutes violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment insofar as they authorize his continued detention without the procedural protections afforded in the civil commitment process.

As to the issue of statutory construction, the Court concludes that, absent competency restoration, the plain terms of the statutes provide for Mr. Topolski's release only upon proof by a preponderance of the evidence that the public safety would not be endangered by his release. However, continued detention under Sections 403 and 404, without the procedural protections and mechanisms for release provided in the civil commitment process, violates his federal constitutional right to equal protection of the law. The Court discerns no rational basis for treating

---

[52] *See State v. Goldsberry*, 2000 WL 710090, at *2–3 (Del. Super. Apr. 26, 2000); *Hampton v. State*, 2000 WL 33115720, at *1–2 (Del. Super. Sept. 29, 2000); *State v. Hinton*, 2018 WL 366971, at *2–3 (Del. Super. Jan. 11, 2018); *State v. Draughn*, 2016 WL 7105933, at *4 (Del. Super. Nov. 29, 2016); *State v. Williamson*, 2020 WL 2790488, at *8–9 (Del. Super. May 29, 2020).

[53] After *Lewis* was decided, *Jackson v. Indiana* was not cited in a published Delaware court decision again until 2000. In that year, this Court addressed two separate challenges to confinement under 11 *Del. C.* § 404. Both of these decisions are discussed at greater length in the Court's previous decision in this case. *See Topolski*, 2023 WL 1816351, at *8. In *Goldsberry*, the Court read *Jackson* as placing a limit on detention under Section 404 but, as further explained *infra*, concluded on the facts before it that "a reasonable period of time necessary to determine whether there is a substantial probability that Goldsberry will attain the capacity to stand trial in the foreseeable future has not elapsed." 2000 WL 710090, at *2–3. In *Hampton*, the Court noted that Delaware's statute differed from the Indiana statute at issue in *Jackson* because it provided for a prima facie hearing that could result in dismissal of the charges and held that the defendant's habeas petition was unripe because a prima facie hearing had not yet been requested. 2000 WL 33115720, at *2. Neither case referenced 11 *Del. C.* § 403 or the public safety requirement for release. Subsequent cases have cited *Goldsberry* as establishing the standard under Delaware law.

an incompetent defendant like Mr. Topolski as though he is an insanity acquittee and thus denying him the key procedural protections afforded to similarly situated civil committees—like Mr. Topolski—who have not been tried or otherwise adjudicated on criminal charges. In light of this conclusion, the Court will briefly address but need not decide the closer constitutional question of whether there is a separate due process violation.

## I.    Statutory Construction

In his supplemental briefing, Mr. Topolski argues that 11 *Del. C.* §§ 404(a) and 403(b) do not apply to him any longer because there is an implicit exception for defendants who have been found unlikely to be restored to competency in the foreseeable future. The Court concludes in this section that the statutes are unambiguous in authorizing continued detention, and as a result are unconstitutional as applied for the reasons set forth in the remainder of this opinion.

When called upon to interpret statutory provisions, the Court follows Delaware's well-settled principles of statutory construction. First, the Court will apply the plain meaning of an unambiguous statute.[54] If, however, statutory language is "reasonably susceptible to different conclusions or interpretations," it is ambiguous,[55] and the Court may consider canons of statutory construction and legislative history.[56] As relevant here, Delaware courts recognize the constitutional avoidance canon of statutory construction, which provides that "courts should avoid interpretations that would render a statute unconstitutional, if that can be done

---

[54] *See Noranda Aluminum Holding Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 977–78 (Del. 2021) ("If the plain statutory text admits only one reading, we apply it.").
[55] *Judicial Watch, Inc. v. Univ. of Delaware*, 267 A.3d 996, 1004 (Del. 2021).
[56] *Noranda*, 269 A.3d at 978 ("If there is a legitimate ambiguity, we consult the canons of statutory construction and may consider legislative history.").

without impairing the legislature's purpose."[57]  That canon, however, only applies where the statutory language is ambiguous.[58]

First, 11 *Del. C.* § 404(a) governs the initial commitment of an incompetent defendant to the DPC, providing that the Court may order "the accused person to be confined and treated in the Delaware Psychiatric Center until the accused person is capable of standing trial."[59]  Mr. Topolski argues that this language does not authorize his continued detention because the statute "does not address the obvious possibility of the 'until' never occurring, i.e., the person being found to never be likely to regain competence to stand trial."[60]  As this Court explained in *Hampton*, 11 *Del. C.* § 404(a) "does not provide for any scenario that ever results in the defendant being released if the State meets its [prima facie] burden and if he never becomes competent to stand trial."[61]  The Court agrees with Mr. Topolski that this is a problematic gap in the statute, especially in light of its constitutional implications.  It does not follow, however, that the Court can step in to fill that gap by rewriting the statute to create a third avenue for release (in addition to the prima facie hearing in Section 404(a) and the public safety inquiry in Section 403(b)) not

---

[57] *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 286 (Del. 2016); *see also State v. Herbert*, 2022 WL 811175, at *2 (Del. Super. Mar. 17, 2022) ("Delaware courts practice constitutional avoidance."); *Mills*, 256 A.2d at 758 ("If this appears to be a strained construction of s 4702(c), it is to be remembered that a strained construction of a statute is permissible to save it against constitutional attack so long as the construction is not carried 'to the point of [perverting] the purpose' of the statute." (quoting *Scales v. United States*, 367 U.S. 203, 211 (1961))).

[58] *See Clark v. Martinez,* 543 U.S. 371, 385 (2005) ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means* of *choosing between them.*"); *Wells Fargo Bank, N.A. v. Estate of Malkin*, 278 A.3d 53, 64–65 (Del. 2022) (explaining that an ambiguous statute should be construed consistently with pre-existing common law and to "avoid constitutional questionability and patent absurdity" (quoting *Sturgill v. M & M, Inc.,* 329 A.2d 360, 362 (Del. 1974))).

[59] 11 *Del. C.* § 404(a).

[60] Def.'s Suppl. Br. at 5.

[61] 2000 WL 33115720, at *1.  *Hampton*'s inquiry was limited to Section 404(a) and did not address the potential avenue for release created by Section 403(b).

provided for by the legislature.[62] Moreover, a comparison to 11 *Del. C.* § 403(b) demonstrates the flaw in Mr. Topolski's argument. When Section 403 says that a confined person, or "patient," shall be held "until . . . the public safety will not be endangered by the patient's release," it is clear—and unambiguous—that the patient will be held until he or she can be safely released, and not that the patient must be released upon a showing that he or she can *never* be safely released.

While not cited by Mr. Topolski, there is language in the *State v. Goldsberry* decision that can be read to suggest that he must be released on statutory (as opposed to constitutional) grounds. Specifically, the Court wrote that while the "statute is silent as to the length of time the State may hold an incompetent defendant[,] . . . surely such silence was not intended by the Legislature as bestowing authority on the State to hold an unconvicted criminal defendant in an institution for what could amount to be a life sentence."[63] The Court later concluded that "11 *Del.C.* § 404(a) does not permit an incompetent criminal defendant to be held indefinitely while awaiting a return to competency."[64] However, *Goldsberry* ultimately did not rely on any statutory language to decide the issue before it—rather, it applied nearly verbatim the constitutional rule articulated in *Jackson*. As the Court explained, "the *Jackson* holding is just as applicable to Goldsberry as it was to Jackson. The question

---

[62] *See Williams v. West*, 479 A.2d 1253, 1255 (Del. 1984) ("[I]f an otherwise valid statute causes or leads to an inequitable result, then it is the sole province of the legislature to correct it."); *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011) (explaining that "where a statute requires an amendment to pass constitutional muster," a court cannot "usurp the legislature's role and rewrite it"); *King Ranch, Inc. v. United States*, 946 F.2d 35, 37 (5th Cir. 1991) ("This Court cannot rewrite Congressional legislation to cover a situation that Congress may not have foreseen. Absent some ambiguity in the statute, we must apply it as written.").

[63] *Goldsberry*, 2000 WL 710090, at *2.

[64] *Id.* at *3; *see also Draughn*, 2016 WL 7105933, at *4 ("As discussed by this Court in the *Goldsberry* decision, section 404(a) certainly 'does not permit an incompetent criminal defendant to be held indefinitely while awaiting a return to competency.'"); *Williamson*, 2020 WL 2790488, at *9 ("In *Goldsberry*, the court held that 11 *Del. C.* § 404(a) 'does not permit an incompetent criminal defendant to be held indefinitely while awaiting a return to competency.'").

before this Court is, therefore, whether there is a substantial probability that Goldsberry will attain the capacity to stand trial in the foreseeable future."[65] Applying that test, the Court found that the defendant's continued confinement was reasonable and accordingly did not order release.[66] As a result, the Court had no need to consider precisely whether release, if eventually required, would be mandated on statutory or on constitutional grounds.

Since *Goldsberry* did opine on the General Assembly's intent in dicta, the Court notes two points with respect to that analysis. First, *Goldsberry* did not make any finding that the statute was ambiguous, so as to lay the foundation for applying the constitutional avoidance canon of construction, nor did it point to any legislative history or principles of construction to support its inference regarding legislative intent. Second, *Goldsberry* did not acknowledge either the prima facie hearing requirement or, more importantly, the release mechanism provided in 11 *Del. C.* § 403. Thus, its conclusion about legislative intent was based, in part, on an incomplete review of the safeguards (albeit limited ones) already explicitly provided for in the statutory text. In sum, while the Court agrees with *Goldsberry* that *Jackson* is controlling and ultimately that Mr. Topolski is entitled to release on constitutional grounds, that relief cannot be derived from Section 404's unambiguous failure to provide for release in this scenario.

As noted *supra*, Section 403(b) provides that a "patient" committed to the DPC pursuant to Section 404(a) "shall be kept there at all times in a secured building until the Superior Court of the county wherein the case would be tried or was tried is satisfied that the public safety will not be endangered by the patient's release."[67] Mr. Topolski argues that the use of the word "patient" throughout Section 403 shows

---

[65] *Goldsberry*, 2000 WL 710090, at *2.
[66] *Id.* at *3.
[67] 11 *Del. C.* § 403(b).

that a person confined at the DPC is "still being actively treated and medically supported in an effort to bring them back to competency."[68] The Court agrees that an individual held at the DPC is a "patient" and should be receiving appropriate treatment and medical support. Moreover, that an individual detained at the DPC is unlikely to be restored to competency would not justify discontinuation of the patient's mental health treatment, or even the discontinuation of competency restoration efforts (however unlikely success may appear).[69] However, there is no allegation before the Court that the doctors at the DPC have stopped treating Mr. Topolski's schizophrenia on account of the unlikelihood of his restoration to competency,[70] nor does this issue have any direct bearing on the question of his entitlement to release.

Unfortunately, despite the holding in *Jackson*, there is no provision of Delaware statutory law providing for the release of incompetent defendants who lack a substantial likelihood of competency restoration, other than the remedies provided in Sections 404(a) and 403(b). The Court finds that those two provisions apply, on their face, to all defendants with pending charges who have not yet been restored to competency. Accordingly, the Court turns to the question of whether confinement pursuant to Sections 404(a) and 403(b) is unconstitutional as applied to Mr. Topolski, a criminal defendant with little chance of being restored to competency in the foreseeable future.

---

[68] Def.'s Suppl. Br. at 5.

[69] *See Rotherham*, 923 P.2d at 1143 (construing New Mexico's criminal commitment statute to require continued treatment "to obtain competency" and "to alleviate the threat of dangerousness").

[70] To the contrary, the DPC report dated May 3, 2023, *see supra* note 39, suggests that DPC staff are still treating Mr. Topolski to the best of their ability.

## II.  Constitutional Limits on Commitment

### a. *Baxstrom* and *Jackson*

*Jackson v. Indiana* is the only controlling authority specifically addressing the long-term pre-trial commitment of incompetent criminal defendants.  However, it is situated within a broader line of U.S. Supreme Court case law developing constitutional limits on the government's civil commitment power (i.e., its power to commit people for reasons other than criminal punishment).  As illustrated in *Jackson*, the primary limits on that power are derived from the Equal Protection Clause and the Due Process Clause.

Prior to *Jackson*, the U.S. Supreme Court in *Baxstrom v. Herold* invalidated on equal protection grounds a New York law that allowed a person to be "civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York."[71]  The Supreme Court found it "untenable" to classify people with criminal records, specifically those nearing the end of their prison terms, by statute along with those dangerously insane where "the State has provided for a judicial proceeding to determine the dangerous propensities of all others civilly committed . . . ."[72]  Notably, nothing in *Baxstrom* indicated that

---

[71] 383 U.S. 107, 110 (1966).

[72] *Id.* at 114.  Following *Baxstrom*, the Delaware Supreme Court in *Mills* found an equal protection violation where Delaware law afforded a jury trial to civil committees on the issue of present mental illness but denied that same protection to insanity acquittees petitioning for release.  256 A.2d at 757 ("In the absence of a reasonable basis for distinction, we hold that it is a denial of equal protection of the laws to deprive a s 4702 patient of the substantial safeguards provided by s 5126 for a s 5125 patient as to release from the Hospital.").  Instead of reversing the trial court's denial of habeas relief, however, the court employed the constitutional avoidance canon and construed the statute to require a jury trial upon an insanity acquittee's petition for release.  *Id.* at 758 ("[W]e hold that the appellant was entitled to a jury trial, in accordance with the above guidelines, upon his application for release under s 4702(c).").  The case was then remanded to the trial court with leave for the appellant "to renew his application under s 4702(c) as herein construed."  *Id.*  The code sections construed in *Mills* were precursors to 11 *Del. C.* § 403 and 16 *Del. C.* ch. 50 (and are no longer in effect).  Since the civil commitment statute no longer requires a jury trial, it is the equal protection analysis in *Mills*, and not the specific holding, that is instructive in this case.

the lack of a jury review violated due process, and no such requirement for civil commitment is recognized under current due process case law. The jury trial was required by federal equal protection principles only because it was provided under New York state law to most civil committees.

*Jackson* relied in large part on *Baxstrom* in its equal protection analysis, reasoning that if "criminal conviction and imposition of sentence are insufficient to justify less procedural and substantive protection against indefinite commitment than that generally available to all others, the mere filing of criminal charges surely cannot suffice."[73] Thus, the court in *Jackson* found an equal protection violation because Indiana law subjected an incompetent defendant "to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and . . . thus condemn[ed] him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by" Indiana's civil commitment statute.[74]

*Jackson*, however, did not rest its holding exclusively on equal protection grounds, and went on to analyze Indiana's statute under the Due Process Clause. First, the Supreme Court held that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[75] More specifically, the Supreme Court held that "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time

---

[73] *Jackson*, 406 U.S. at 724.
[74] *Id.* at 730.
[75] *Id.* at 738.

necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."[76]

Taken together, *Baxstrom* and *Jackson* indicate that a commitment statute in the criminal process can run afoul of the federal constitution by either 1) differing unreasonably from the state's generally applicable civil commitment statute (equal protection) or 2) confining people longer than is reasonably justified by the purpose for which the individual is committed (due process).

### b. *Jones* and *Foucha*

Two later cases applied these principles specifically to insanity acquittees. In *Jones v. United States*, the U.S. Supreme Court held that "when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society."[77] Applying the general due process rule from *Jackson*, the Supreme Court reasoned that "commitment following an insanity acquittal" had a reasonable relation to its purpose, which, like civil commitment, is "to treat the individual's mental illness and protect him and society from his potential dangerousness."[78] The Court distinguished *Jackson* by noting that there has been "proof beyond a reasonable doubt that the acquittee committed a criminal act," whereas in *Jackson* "there never was any affirmative proof that the accused had committed criminal acts or otherwise was dangerous."[79] The Supreme Court found the same considerations sufficient to address any equal protection concerns, stating by way of explanation only that if

---

[76] *Id.*
[77] 463 U.S. 354, 370 (1983).
[78] *Id.* at 368.
[79] *Id.* at 364 n.12.

"the Due Process Clause does not require that an insanity acquittee be given the particular procedural safeguards provided in a civil-commitment hearing . . . , then there necessarily is a rational basis for equal protection purposes for distinguishing between civil commitment and commitment of insanity acquittees."[80]

In *Foucha v. Louisiana*, however, the U.S. Supreme Court distinguished *Jones* and held that once an insanity acquittee's sanity is restored, further detention based on dangerousness alone violates due process.[81] Once the defendant's sanity was restored, "the basis for holding [the acquittee] in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis."[82] A plurality of the Court in *Foucha* would have also found an equal protection violation,[83] but Justice O'Connor, who cast the necessary fifth vote, found it "unnecessary to reach equal protection issues on the facts" of that case.[84]

### c. Difference Between Equal Protection and Due Process

In light of the foregoing cases, the relationship between the equal protection and due process analyses is not perfectly clear, and *Jones* at least suggested that the arguments might be interchangeable. However, following *Jackson*, the closest on-point authority, this Court treats the equal protection and due process arguments as separate grounds on which Mr. Topolski can argue for release. The due process analysis turns on the reasonableness of a person's commitment and the basis for it in more absolute terms, whereas the equal protection analysis evaluates the reasonableness of commitment relative to the civil commitment process as an alternative, i.e., requiring an analysis of the reasonableness of deviating from the

---

[80] *Id.* at 362 n.10.
[81] 504 U.S. 71, 77–78 (1992).
[82] *Id.* at 78.
[83] *See id.* at 84–86.
[84] *Id.* at 88 (O'Connor, J., concurring in part).

22

state's generally applicable civil commitment statute.[85] While *Jackson*'s equal protection and due process analyses were "closely related,"[86] it is the equal protection analysis that goes most directly to the question at the core of this case—not whether Delaware has the power to involuntarily confine a person who is both mentally ill and dangerous, but instead, whether and to what extent the state can impose different procedures on an incompetent criminal defendant and on a civil committee.

## III. Equal Protection

### a. Standard of Review

"In any equal protection case, the threshold issue is the standard of review to be applied to the government action in question."[87] In most cases, courts apply rational basis review, in which case "the person objecting to the state action bears the burden of proving the lack of rational justification."[88] However, state action infringing upon a "fundamental right" or "suspect classification" triggers strict scrutiny, which requires the state to prove that the distinction drawn "is narrowly tailored to advance a compelling government interest."[89] Between strict scrutiny and rational basis is intermediate scrutiny, a test generally reserved for quasi-suspect classifications such as gender or illegitimacy.[90]

---

[85] For example, neither *Baxstrom* nor the Delaware Supreme Court's decision in *Mills* suggested that a jury trial is required by due process in civil commitment proceedings, but nevertheless found equal protection violations when that procedural right was afforded to typical civil committees but denied to a subclass of individuals involuntarily committed on account of potential dangerousness and mental illness. While states have discretion as to what procedural protections to afford in their civil commitment proceedings, they are required, at a minimum, to require proof by clear and convincing evidence of both mental illness and dangerousness. *Addington*, 441 U.S. at 433; *Foucha*, 504 U.S. at 75–76.

[86] *Jackson*, 406 U.S. at 731.

[87] *Turnbull v. Fink*, 668 A.2d 1370, 1379 (Del. 1995).

[88] *Id.*

[89] *Id.*

[90] *Id.* Some courts, representing a minority view, also apply intermediate scrutiny where an important but not fundamental right is implicated. *See, e.g.*, *James v. Se. Pennsylvania Transp.*

23

The Court indicated in its previous opinion that Mr. Topolski's equal protection challenge is subject to rational basis review because "incompetent criminal defendants have never been identified as a suspect class under equal protection jurisprudence . . . ."[91] Mr. Topolski has not taken issue with that assertion. However, given the importance of the legal issues posed by this case, and the often-dispositive nature of the chosen standard of review in equal protection analysis,[92] this point warrants further discussion.

In *Jackson*, the U.S. Supreme Court found an equal protection violation without explicitly identifying or applying any particular standard of review. *Jackson*, however, relied in large part on *Baxstrom*, which, as discussed *supra*, struck down a special commitment procedure for inmates nearing the end of their prison sentences. *Baxstrom* employed language indicative of rational basis review, e.g., that there was no "conceivable basis" for or "semblance of rationality" to treating prisoners nearing the end of their prison terms differently than similarly situated civil committees.[93] Echoing this language, *Jackson* also required only a "reasonable justification" for distinctions drawn between different groups of people with respect to involuntary commitment standards.[94]

---

*Auth.*, 477 A.2d 1302, 1306 (Pa. 1984) ("Finally, in the third type of cases, if 'important,' though not fundamental rights are affected by the classification, or if 'sensitive' classifications have been made, the United States Supreme Court has employed what may be called an intermediate standard of review, or a heightened standard of review."); *United States v. Coleman*, 166 F.3d 428, 431 (2d Cir. 1999) ("In order to trigger intermediate scrutiny, a challenged law must employ some sort of 'quasi-suspect classification,' or implicate an important, though not constitutional, right." (internal citation omitted)).

[91] *Topolski*, 2023 WL 1816351, at *10.

[92] *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013) ("[T]he standard of review (*i.e.,* rational basis review or strict scrutiny) is often outcome determinative.").

[93] 383 U.S. at 111, 115 (1966); *see also United States v. Timms*, 664 F.3d 436, 446 (4th Cir. 2012) ("[I]n *Baxstrom*, the Supreme Court concluded that a state's civil commitment scheme violated the Equal Protection Clause, but in so doing, it observed there was no 'semblance of rationality' for the statute's distinctions, thus appearing to apply rational basis review.").

[94] *Jackson*, 406 U.S. at 729.

Overall, the U.S. Supreme Court has never clearly specified which standard of review applies to equal protection challenges to involuntary commitment laws.[95] In light of the lingering uncertainty, some state courts have applied a heightened standard of review with respect to involuntary commitment, reasoning that such laws implicate an individual's fundamental or important right to liberty.[96] Most federal appellate courts considering the issue, however, have found that rational basis is the appropriate standard of review.[97] For example, the Fourth Circuit Court of Appeals has held that "rational basis review is the appropriate level of judiciary scrutiny" to apply to equal protection challenges to involuntary commitment statutes (1) because

[95] The plurality opinion in *Foucha* injected some confusion, suggesting that "[f]reedom from physical restraint being a fundamental right, the State must have a particularly convincing reason" to justify its "discrimination against insanity acquittees who are no longer mentally ill." *Foucha*, 504 U.S. at 86 (plurality opinion). Taken at face value, the "fundamental right" language would trigger strict scrutiny, while the "particularly convincing reason" test sounds like a heightened standard higher than rational basis but still less than strict scrutiny. The only mention of strict scrutiny, however, appeared in the dissent, which noted that the U.S. Supreme Court "has *never* applied strict scrutiny to the substance of state laws involving involuntary confinement of the mentally ill, much less to laws involving the confinement of insanity acquittees." *Id.* at 118–19 (Thomas, J., dissenting).

[96] *See, e.g.*, *Rotherham*, 923 P.2d at 1139–40 (applying strict scrutiny to an equal protection challenge to the involuntary commitment of incompetent and dangerous defendants because such commitment "impinges on that person's constitutional guarantee of liberty"); *State v. Dyous*, 53 A.3d 153, 167 (Conn. 2012) (indicating that "the balance of persuasive authority favors applying intermediate scrutiny" to an equal protection challenge to commitment procedures for insanity acquittees because commitment implicates a person's right to liberty).

[97] *See, e.g.*, *Varner v. Monohan*, 460 F.3d 861, 865 (7th Cir. 2006) (holding that commitment of people convicted of sex offenses implicates "neither fundamental rights nor suspect classes"); *United States v. Weed*, 389 F.3d 1060, 1071 (10th Cir. 2004) (holding that insanity acquittees are not members of a suspect class, nor is a fundamental right at stake in their civil commitment); *United States v. Jackson*, 553 F.2d 109, 120 (D.C. Cir. 1976) ("Neither *Jackson* nor *Baxstrom*, however, leads to the outcome appellant seeks. First, in neither case did the Court hold that strict scrutiny applies to procedures used for the criminal commitment of mentally ill persons. . . . Thus, the statute here in issue must be upheld if there is a rational basis for the scheme it creates."); *cf. Seeboth v. Allenby*, 789 F.3d 1099, 1105 (9th Cir. 2015) (concluding on habeas review of state court proceedings that "state courts reasonably may apply the rational basis test when considering equal protection challenges to civil commitment laws"); *but see Francis S. v. Stone*, 221 F.3d 100, 111–12 (2d Cir. 2000) (adopting a heightened standard of review akin to intermediate scrutiny for constitutional challenges to civil commitment schemes).

"the Supreme Court has never required greater than rational basis review," (2) because "rational basis review is the generally-applicable standard," and (3) "in light of the language in *Baxstrom*" suggesting that the distinction need only be reasonable.[98]  Moreover, rational basis review is consistent with the standard applied by Delaware courts, including the Delaware Supreme Court, in past challenges to commitment pursuant to 11 *Del. C.* § 403 brought by insanity acquittees.[99]  Since the weight of controlling, as well as persuasive, authority favors rational basis review, the Court will conduct its analysis under that framework.  However, since the Court concludes that even the lower standard of rational basis is not met, the same result would be reached under either level of heightened scrutiny.

### b.  Differences Between Title 11 Commitment and Civil Commitment

In order to conduct meaningful equal protection review, the Court must first identify the key differences between the two statutory schemes.  Based on the Court's review of the two commitment systems, explained *supra*, there are three key differences for equal protection purposes: (1) the burden of proof; (2) the frequency of review; and (3) the administrative release process.  Regarding the burden of proof, Section 403 relieves the State of its higher burden of proof and flips that burden altogether, requiring the defendant instead to prove his own lack of dangerousness

---

[98] *Timms*, 664 F.3d at 446.

[99] *See Lewis*, 403 A.2d at 1119 ("Unlike the involuntary civil committee who generally denies the existence of the mental condition for which he is committed, the insanity acquitee has been provided a judicial hearing at which he has alleged and proven by a preponderance of the evidence the very mental condition which he has manifested in past criminal action and for which, by reason of the presumption of continuing mental illness, he is committed. We believe this provides **a rational basis for the insanity acquitee's immediate commitment.**" (emphasis supplied)); *Witherup*, 1996 WL 527284, at *1–2 (explicitly applying rational basis review to an equal protection challenge to the release procedures under 11 *Del. C.* § 403); *cf. Mills*, 256 A.2d at 757 ("Because we find **no rational justification for withholding from a s 4702 patient the safeguard of jury trial of the issue of present mental illness**, we construe s 4702(c) to require jury trial of that issue." (emphasis supplied)).

by a preponderance of the evidence.[100]  Second, whereas an individual civilly committed is entitled to review of the continued necessity of his or her commitment every three months,[101] an individual held under Section 403 is initially entitled to reconsideration after one year, and after that first year, the Court reconsiders the necessity of detention only "upon petition on the patient's behalf or whenever advised by the Psychiatric Center that the public safety will not be endangered by the patient's release."[102]  In other words, an incompetent criminal defendant bears not only the burden of proof but also the burden of going forward.  Third and finally, the process of administrative release, whereby the doctors of the DPC may release an involuntary patient who no longer meets the requirements for commitment,[103] is simply not available to a person committed under Section 403.[104]

### c. Incompetence Differs from Insanity

In effect, Delaware law treats (and confines) an incompetent criminal defendant like Mr. Topolski as though he has been found not guilty by reason of insanity, rather than as an accused person awaiting trial.  The Court concludes, in light of the principles set forth in *Jackson*, that such treatment does not satisfy even rational basis review.

The fundamental flaw in this legislative scheme is that it fails to account for the differences between an incompetent defendant and an insanity acquittee.[105]  Both

---

[100] *Witherup*, 1996 WL 527284, at *1.
[101] 16 *Del. C.* §§ 5011(c)–(d) and 5018(a).
[102] 11 *Del. C.* § 403(b).
[103] 16 *Del. C.* § 5010.
[104] *See Lewis*, 403 A.2d at 1120 (holding that "such administrative release procedure is inapplicable to insanity acquitees committed to the Delaware State Hospital").
[105] *See Medina v. California*, 505 U.S. 437, 448 (1992) ("This analogy is not convincing, because there are significant differences between a claim of incompetence and a plea of not guilty by reason of insanity."); *see also Jackson,* 406 U.S. at 739 ("Petitioner argues that he has already made out a complete insanity defense. Jackson's criminal responsibility at the time of the alleged offenses, however, is a distinct issue from his competency to stand trial."); *Mills*, 256 A.2d at 756 ("The answer lies in the difference between the mental illness which precludes responsibility for crime

dispositions involve mental illness, but only an insanity acquittal requires an affirmative finding that the defendant was mentally ill *at the time of the offense*. Specifically, an insanity defense focuses on the defendant's mental illness at the time of the charged conduct, whereas incompetency speaks only to the defendant's mental illness at the time of the proceedings. A defendant is incompetent to stand trial, regardless of the underlying charge, if he lacks "a rational as well as factual understanding of the proceedings against him" or "a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding."[106] By contrast, an insanity acquittal under Delaware law means that "at the time of the conduct charged, as a result of mental illness or serious mental disorder, the accused lacked substantial capacity to appreciate the wrongfulness of the accused's conduct."[107] Implicit in the insanity acquittal is a presumption that the person committed acts that would constitute criminal conduct if committed by a person capable of appreciating the wrongfulness of those acts.

Both the U.S. Supreme Court and the Delaware Supreme Court have upheld commitment and release procedures for insanity acquittees that differ significantly from generally applicable civil commitment laws. However, the lynchpin of that analysis—the presumption of continuing mental illness—has no rational application in the incompetency context.[108] Under the presumption of continuing mental illness,

---

and the mental illness which precludes trial. While the ability to distinguish between right and wrong is the test of responsibility for crime, the defendant's ability to understand the proceedings against him and properly to assist in his own defense are the test of competency to stand trial." (internal citations omitted)).

[106] *Kostyshyn v. State*, 51 A.3d 416, 420 (Del. 2012) (quoting *Jermyn v. Horn,* 266 F.3d 257, 283 (3d Cir. 2001)).

[107] 11 *Del. C.* § 401(a).

[108] *See Lewis*, 403 A.2d at 1117 ("[O]ur conclusion is based in part on the presumption that mental illness which a defendant has alleged and proven by a preponderance of the evidence to have existed at the time he performed the criminal acts, continues until such time as the presumption is satisfactorily rebutted."); *Jones*, 463 U.S. at 366 ("Nor can we say that it was unreasonable for

an insanity acquittee is presumed (until the acquittee proves otherwise) to continue to be unable to distinguish right from wrong and thus to pose a danger of future criminal activity. As the Delaware Supreme Court explained in *Mills*,

> [t]his presumption of continuing mental illness is particularly apposite in this State by reason of our adherence to the rule that, **upon the plea of mental illness as a defense in a criminal case, the defendant has the burden of proving his mental illness to the satisfaction of the jury by a preponderance of the evidence**; and that acquittal on the ground of mental illness may not result from reasonable doubt of mental condition, as in some jurisdictions, but only from a specific adjudication by the jury of mental illness at the time of the offense.
>
> . . . .
>
> In this jurisdiction . . . **the verdict and judgment of acquittal by reason of insanity amounts to an actual adjudication of mental illness at the time of the offense[—]a very solid basis upon which the presumption of continuing mental illness may rest.**[109]

The only analogous presumption that could be made regarding an incompetent defendant is that the defendant remains unable to comprehend the proceedings or to assist in the preparation of a defense. Such a presumption does not raise a rational inference of future criminality or dangerousness.

As the U.S. Supreme Court explained in *Jones*, "[a] verdict of not guilty by reason of insanity establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) **he committed the act because of mental illness.**"[110] Neither fact has been established with respect to an incompetent defendant such as Mr. Topolski. First, only a prima facie case of guilt, i.e., some credible evidence tending to prove each element of the offense, has been established

---

Congress to determine that the insanity acquittal supports an inference of continuing mental illness.").

[109] *Mills*, 256 A.2d at 755 (emphasis supplied).

[110] *Jones*, 463 U.S. at 363 (emphasis supplied).

with respect to Mr. Topolski.[111]   This preliminary showing that the State has sufficient evidence to maintain a prosecution and thus to confine the defendant for competency restoration efforts is not, however, a sufficient adjudication of criminal conduct either to support a presumption of continued dangerousness or to justify indefinite commitment.[112]

Moreover, even assuming *arguendo* that a prima facie case of guilt was sufficient to establish that the defendant committed a criminal act, no showing whatsoever has been made that the defendant committed that act on account of mental illness.  An insanity acquittee is required to prove that he or she is no longer

---

[111] The U.S. Supreme Court in *Jones* reasoned that an insanity acquittee's alleged criminal conduct must have been proven beyond a reasonable doubt, 463 U.S. at 364, but this does not appear to be required under Delaware law.  *See Sanders v. State*, 585 A.2d 117, 131 (Del. 1990) (explaining 1) that a verdict of guilty but mentally ill requires proof beyond a reasonable doubt of the defendant's guilt and 2) that a defendant must prove insanity by a preponderance of the evidence before a verdict of not guilty by reason of insanity, but saying nothing about the factual showing required to establish that an insanity acquittee committed criminal acts); *cf.* Del. Super. Ct. P.J.I. Crim. § 5.31, Mental Illness or Mental Defect (2022) ("If . . . you find that this affirmative defense is established by a preponderance of the evidence, then you must find the defendant not guilty. Even if the defendant has not met this burden of proof for this particular affirmative defense, you must find the defendant not guilty if you find that the State has not met its burden of proving its case beyond a reasonable doubt.").

[112] Federal statutes governing confinement of incompetent defendants and insanity acquittees allocate the burden of proof differently for similar reasons, as the Sixth Circuit Court of Appeals recently explained in *United States v. Williams*.  --- F.4th ----, 2023 WL 3945846, at *5 (6th Cir. June 12, 2023).  Pursuant to 18 U.S.C. § 4243(d), an insanity acquittee in the federal system bears the burden of proving "that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect."  In *Williams*, the court explained that "§ 4243 reflects a presumption that individuals acquitted on the basis of insanity pose a continuing danger to the public until they prove otherwise." 2023 WL 3945846, at *5.  However, it noted that the "opposite presumption . . . applies before a finding of guilt," and went on to contrast § 4243 with 18 U.S.C. § 4246.  *Id.*  Because § 4246 deals with the involuntary confinement of federal defendants found incompetent to stand trial, "[t]he government, it follows, bears the burden of showing that such a person poses a danger, just as it would otherwise bear the burden of showing guilt."  *Id.*  Accordingly, when a federal defendant is found to be unlikely to be restored to competency within a reasonable period of time, continued confinement is authorized by statute only upon a showing by "clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another . . . ." 18 U.S.C. § 4246(d).

dangerous in order to secure release because the acquittee proved at the outset that he or she was mentally ill in order to evade criminal punishment.[113] By contrast, neither an incompetent defendant nor the State is required to prove that the defendant committed a criminal act *because of mental illness*. In fact, no affirmative proof of mental illness is required at all, because a defendant will be found incompetent if the State *fails to prove* that he or she is competent to stand trial.[114]

In sum, as a result of an insanity acquittee's raising and proving the acquittee's own mental illness in connection with criminal conduct, the burden shifts from the State to justify detention to the insanity acquittee to justify release.[115] No similar showing has ever been made with respect to an incompetent defendant, but Delaware law nonetheless shifts the burden to the defendant to secure release.

### d. Unconstitutionality of Different Release Procedures

There is no question that the state has the power to confine an individual who is both mentally ill and dangerous. The equal protection violation in *Jackson*, however, was not just the detention itself—it was "condemning him in effect to permanent institutionalization *without the showing required for commitment or the opportunity for release*."[116] As explained in *Jackson*, "the State cannot withhold

---

[113] *See Lewis*, 403 A.2d at 1119 ("Unlike the involuntary civil committee who generally denies the existence of the mental condition for which he is committed, the insanity acquitee has been provided a judicial hearing at which he has alleged and proven by a preponderance of the evidence the very mental condition which he has manifested in past criminal action and for which, by reason of the presumption of continuing mental illness, he is committed.").

[114] *See Smith v. State*, 918 A.2d 1144, 1148 (Del. 2007) ("The prosecution bears the burden of proving a defendant's legal competency by a preponderance of the evidence." (quoting *Randolph v. State*, 878 A.2d 461, 2005 WL 1653635, at *1 (Del. 2005) (TABLE))).

[115] *See United States v. Mikulich*, 732 F.3d 692, 700 (6th Cir. 2013) ("A finding of insanity shifts the burden from the Government to the insanity acquittee, who must prove that he is *not* dangerous before he may be released.").

[116] *Jackson*, 406 U.S. at 730 (emphasis supplied); *cf. Mills*, 256 A.2d at 757–58 (finding no equal protection violation in an insanity acquittee's initial commitment but holding that denial of a jury trial on the insanity acquittee's eligibility for release violated equal protection); *Jones*, 463 U.S. at 363 n.11 (noting that it was addressing only the constitutionality of commitment and not the release procedures).

31

from a few the procedural protections or the substantive requirements for commitment that are available to all others."[117] "The harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release."[118]

The Third Circuit's decision in *Doe v. Pennsylvania Board of Probation and Parole* is instructive on this point.[119] In *Doe*, the plaintiff challenged a Pennsylvania law that subjected sex offenders from out of state to automatic community notification requirements, but provided a civil hearing to those with in-state offenses to determine the person's risk of re-offending.[120] The court of appeals applied rational basis review.[121] While the court "readily agree[d] that protecting its citizens from sex offenses committed by repeat offenders is a legitimate state interest," it nevertheless rejected Pennsylvania's contention that "denial of equivalent process to both in-state and out-of[-]state parolees is rationally related to its security concerns."[122] In other words, the government cannot arbitrarily deprive a subclass of dangerous individuals certain procedural protections while affording them to others. Likewise, in this case, there is no question that protecting citizens from dangerous, mentally ill individuals is an important state interest—rather, the procedural disparity is the gravamen of the equal protection claim.

The State argues that a charge and prima facie case for a violent offense together provide "a rational basis for somewhat different treatment" and that "a

---

[117] *Jackson*, 406 U.S. at 727.
[118] *Id.* at 729.
[119] 513 F.3d 95 (3d Cir. 2008).
[120] *Id.* at 99–100.
[121] *See id.* at 107 (declining to reach the issue of whether a higher standard of review should apply because "the Commonwealth's restrictions would not survive the lower threshold of rational basis review").
[122] *Id.* at 108.

criminal defendant who has actually been charged with a crime seems more obviously a threat to the public than someone who has simply been deemed to have the potential to become violent."[123]   In other words, the State argues that the distinction is rational because someone against whom a prima facie case of a crime has been made (especially a violent crime) is more likely to be dangerous.  First, the Court notes that a person subject to involuntary commitment is someone who "[b]ased upon manifest indications" poses a danger to oneself or others.[124]  This must be proven by clear and convincing evidence,[125] taking into account the "person's history, recent behavior and any recent act or threat."[126]  Thus, the General Assembly has already seen fit to provide certain procedural protections to very dangerous people, including those who have exhibited signs of dangerous conduct in the past. If a person is "obviously" mentally ill and presently dangerous on account of past criminal conduct, charged or uncharged, it is far from clear why the state should have any difficulty meeting the clear and convincing evidence standard for civil commitment.

Second, the Court need not and does not hold, as Mr. Topolski suggests it should, that an incompetent defendant must be held to precisely the same standards of commitment and release as civil committees.[127]  However, the combined effect of the distinctions here—the flipped burden of proof, the burden of going forward, the infrequency of review, and the unavailability of administrative release—is a starkly different procedural framework for the incompetent defendant as compared to the civil committee.  While this difference has passed constitutional muster with respect

---

[123] State's Suppl. Br. at 3.
[124] 16 *Del. C.* § 5011(a).
[125] *Id.*
[126] *Id.* § 5001(3).
[127] *See Commonwealth v. Burgess*, 878 N.E.2d 921, 930 (Mass. 2008) ("The Commonwealth need only provide substantially similar, and not identical, procedural safeguards.").

to insanity acquittees, no case law that the Court can identify has upheld such vastly different treatment based on incompetency to stand trial.

The State cites *State v. Rotherham*,[128] an opinion of the Supreme Court of New Mexico, as "authority for the proposition that a rational statutory scheme for 'criminal commitment' of dangerous criminal defendants can pass constitutional muster under *Jackson* if the State can establish that there is a valid factual basis for the criminal charges by means of a hearing."[129] In *Rotherham*, the court dealt with an equal protection challenge to New Mexico's "criminal commitment" of incompetent defendants found not to have a substantial probability of obtaining competency within one year.[130] That procedure required a showing of 1) "clear and convincing evidence that the defendant committed the criminal act charged"; and 2) that the defendant "is dangerous."[131] Both the findings of incompetence and dangerousness were to be reviewed every two years, and the defendant could not be detained longer than the maximum sentence that would have been available had the defendant been convicted.[132] The Supreme Court of New Mexico found that this statutory scheme withstood not just rational basis review but strict scrutiny, noting first that "[t]he State has an interest in rendering a defendant competent to stand trial, and, as long as they remain dangerous, the State has an interest in committing them to protect the defendants and the public."[133] It went on to explain that, under New Mexico law, "there are various steps at which the State cannot continue to confine an incompetent defendant and must either release, civilly commit, or prosecute

---

[128] 923 P.2d 1131 (N.M. 1996).
[129] State's Suppl. Br. at 4.
[130] 923 P.2d at 1138.
[131] *Id.*
[132] *Id.* at 1138–39.
[133] *Id.* at 1140.

him."[134]  Accordingly, the statutes "do not permit the type of permanent institutionalization proscribed by *Jackson.*"[135]

However, *Rotherham*, as the State concedes,[136] is far from directly on point, as the statute at issue in that case provided significantly greater procedural protections than the statutes at issue here.  Specifically, it 1) required clear and convincing evidence *by the state* of the defendant's criminal guilt and dangerousness;[137] and 2) provided for review of a defendant's incompetency and dangerousness every two years.  The procedural protections afforded to an incompetent defendant under Delaware law are conspicuously minimal in comparison.  Once the State establishes a prima facie case of guilt and the Court finds that the defendant is dangerous, that defendant could plausibly sit in custody indefinitely without further review of the necessity of detention—and as to the finding of dangerousness, the defendant bears the burden of showing that "the public safety will not be endangered by the patient's release."[138]  In other words, the result

---

[134] *Id.* at 1141.

[135] *Id.*

[136] *See* State's Suppl. Br. at 4 ("The Delaware statutes applicable to Mr. Topolski's case are in some ways similar to the New Mexico statutes at issue in *Rotherham*, although they are not identical.").

[137] While not entirely clear from the statute itself, the Supreme Court of New Mexico appears to have read the clear and convincing standard as applying to both the finding of criminal conduct and to the finding of dangerousness.  *Rotherham,* 923 P.2d at 1144 ("Under the NMMIC, a defendant may be criminally committed if, by clear and convincing evidence, he or she committed the act or acts underlying the crime or crimes charged and is dangerous.").  Even if a lower burden of proof applied to dangerousness, the New Mexico scheme is distinguishable from Delaware's in several ways, e.g., placing the burden of proof on the state, requiring proof by clear and convincing evidence of the charged conduct, and providing for automatic review of commitment at least every two years.

[138] 11 *Del. C.* § 403(b). While the State correctly points out that the defendant may petition for release at any time, State's Suppl. Br. at 3, the Court finds it significant that the burden of going forward with such a proceeding is placed on the institutionalized and mentally ill defendant rather than on the State.

is disturbingly similar to the "permanent institutionalization" held unconstitutional in *Jackson*.

The Court is, of course, mindful that rational basis review is highly deferential to enactments of the legislature and is not "a license for courts to judge the wisdom, fairness, or logic of legislative choices."[139] Moreover, rational basis review does not "require specific facts to justify the government's legitimate purpose; all it asks is whether a policy is rational based on 'any reasonably conceivable state of facts.'"[140] However, rational basis review, while highly deferential, is still substantive review. The Third Circuit, for example, has "repeatedly warned that rational basis review is by no means 'toothless'—'[a] necessary corollary to and implication of rationality as a test is that there will be situations where proffered reasons are not rational.'"[141] Finally, the Court must reconcile this deferential standard with the U.S. Supreme Court's equal protection analysis in *Jackson*. Accordingly, the Court holds that Mr. Topolski's continued detention under Section 403 violates his right to equal protection. At the very least, the State must prove Mr. Topolski's dangerousness by clear and convincing evidence, as provided for in 16 *Del. C.* § 5011.

## IV. Due Process[142]

While the equal protection violation is alone sufficient to warrant relief, the U.S. Supreme Court in *Jackson* separately held that due process "requires that the

---

[139] *Heller v. Doe*, 509 U.S. 312, 319 (1993) (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313 (1993)).

[140] *Stradford v. Sec'y Pennsylvania Dep't of Corr.*, 53 F.4th 67, 79 (3d Cir. 2022) (quoting *Beach Commc'ns*, 508 U.S. at 313).

[141] *Heffner v. Murphy*, 745 F.3d 56, 79 (3d Cir. 2014) (quoting *Doe*, 513 F.3d at 112 n.9); *see also Doe*, 513 F.3d at 112 n.9 ("An undercurrent to our dissenting colleague's argument is that under rational basis review, the government always wins. That, quite simply, cannot be so. In fact, were that the case, our review of issues under this standard would be equivalent to no review at all.").

[142] This is best characterized as a claim of substantive due process, which "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Foucha*, 504 U.S. at 80 (quoting *Zinermon v. Burch,* 494 U.S. 113, 125 (1990)).

nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[143] Applying this principle to defendants held solely on account of incompetency to stand trial, the Supreme Court held that such a person "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."[144] That holding clearly applies when the only basis for commitment is the defendant's incompetency, in which case the sole purpose of confinement is competency restoration. However, Delaware's statutory scheme poses a more difficult question on the due process issue because Section 403(b) implicates another purpose for commitment, i.e., public safety.[145]

This public safety concern is particularly relevant to the due process question in light of *Jackson*'s discussion of a prior U.S. Supreme Court case, *Greenwood v. United States*.[146] In *Greenwood*, the Supreme Court upheld a federal district court's commitment of an incompetent defendant, "even though there was little likelihood that he would ever become competent to stand trial," after the district court had "found specifically that Greenwood would be dangerous if not committed."[147] *Jackson* discussed *Greenwood* only briefly in its equal protection analysis, noting that "[n]o issue of equal protection was raised or decided" in that case.[148] However, the *Jackson* Court went to greater lengths to distinguish *Greenwood* in its due process analysis, explaining that *Greenwood* "upheld only the initial commitment without considering directly its duration or the standards for release" and "sustained

---

[143] *Jackson*, 406 U.S. at 738.

[144] *Id.*

[145] While decision on the due process question is not necessary in light of the equal protection holding, the Court writes briefly on the issue in the interest of a full discussion of *Jackson*'s implications for Delaware's statutory scheme and to explain why, as between the two constitutional grounds raised in *Jackson*, the Court rests its holding on the equal protection ground.

[146] 350 U.S. 366 (1956).

[147] *Jackson*, 406 U.S. at 732.

[148] *Id.* at 726.

commitment only upon the finding of dangerousness."[149] *Jackson* nevertheless implied that the permissible duration of an incompetent defendant's confinement can be extended by an explicit finding of dangerousness.[150]

In the insanity context, the U.S. Supreme Court explained in *Jones* that "[d]ifferent considerations underlie commitment of an insanity acquittee. As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness."[151] In *Foucha*, however, the Supreme Court distinguished *Jones* and held that once an insanity acquittee's sanity is restored, further detention based on dangerousness alone violates due process.[152] The Court went on to hold, citing *Jackson*, that once an individual "can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his confinement."[153] *Foucha* also emphasized that in a civil commitment proceeding, "the State is required by the Due Process Clause to prove by clear and convincing evidence the two statutory preconditions to commitment: that the person sought to be committed is mentally ill and that he requires hospitalization for his own welfare and protection of others."[154] While *Foucha* did not reference *Jackson*'s discussion of a finding of dangerousness, it characterized *Jackson* as holding that to confine an incompetent defendant longer

---

[149] *Id.* at 736.

[150] *Id.* at 733 (explaining that under the federal statute, after *Greenwood*, "[w]ithout a finding of dangerousness, one committed thereunder can be held only for a 'reasonable period of time' necessary to determine whether there is a substantial chance of his attaining the capacity to stand trial in the foreseeable future"); *see also United States v. Sahhar*, 917 F.2d 1197, 1207 (9th Cir. 1990) ("Consistent with the requirements of due process, section 4246 requires the government to prove by clear and convincing evidence that an incompetent defendant presents a substantial risk of bodily injury or serious property damage.").

[151] *Jones*, 463 U.S. at 369 (internal citation omitted).

[152] 504 U.S. at 77–78 (explaining that once the acquittee's sanity was restored, "the basis for holding [the acquittee] in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis").

[153] *Id.* at 79.

[154] *Id.* at 75–76.

than is justified for competency restoration efforts, "the State was required to afford the protections constitutionally required in a civil commitment proceeding."[155] Based on *Foucha*, there is certainly an argument to be made that once a defendant confined for purposes of competency restoration is unlikely to be restored to competency, that defendant is similarly situated to the now-sane insanity acquittee in *Foucha* in that continued detention is based on dangerousness alone,[156] which in a civil commitment proceeding must be proven by the state by clear and convincing evidence.[157] However, the Court need not reach the question of whether, like the Louisiana statute at issue in *Foucha*, Section 403(b) violates Mr. Topolski's due process rights by placing "the burden on the detainee to prove that he is not dangerous."[158] It is enough, as explained above, to conclude that the procedural disparity between Section 403(b) and the statutory requirements for civil commitment warrants relief on equal protection grounds.

## RELIEF

Detention pursuant to 11 *Del. C.* §§ 403 and 404, instead of under generally applicable civil commitment procedures, violates Mr. Topolski's right to equal protection of the law, and those statutes are therefore unconstitutional as applied to

---

[155] *Id.* at 79.

[156] *See State v. Ray*, 57 A.3d 444, 456 (Md. 2012) ("Indeed, if there is no substantial probability that the IST commitment will result in the defendant's gaining competence in the foreseeable future, *the purpose of the commitment is no longer making the defendant competent but rather punishing him for a crime of which he has not been convicted or protecting public safety without going through the civil commitment process.*" (internal citations omitted) (emphasis supplied)).

[157] *Foucha*, 504 U.S. at 75–76.

[158] *Id.* at 81–82. In contrast to Delaware law, under the current federal statutory scheme, once an incompetent defendant is found to lack a substantial probability of obtaining capacity to stand trial in the foreseeable future, the defendant may be civilly committed upon a showing by clear and convincing evidence by the government "that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another . . . ." 18 U.S.C. §§ 4241(d) and 4246(d). Only after that initial commitment, supported by clear and convincing evidence, is the defendant required to prove the defendant's nondangerousness by a preponderance of the evidence in order to secure release. *Id.* § 4246(e).

defendants without a substantial likelihood of competency restoration in the foreseeable future. Since the Section 403(b) release procedure is constitutionally inadequate to test the legality of his continued confinement, Mr. Topolski is entitled to relief under the principle articulated in *Curran*, and applied in *Mills*, that the state "must provide an adequate procedure to give a person deprived of his freedom the opportunity to have the intrinsic fairness of the criminal process under which he is committed examined into . . . ."[159]

As noted *supra*, the relief granted in *Mills* was not a writ of habeas corpus, but rather a construction of the statute intended to save it from unconstitutionality and a new hearing under the statute as construed.[160] The Court has considered whether Section 403(b) could be saved by construing it to place the burden of proof on the State to prove dangerousness. However, even assuming such a construction would render it constitutional (despite other major differences from the civil commitment statute), the plain language of Section 403 requires that the Court be "satisfied that the public safety will not be endangered by the patient's release," or, as explained *supra*, that there is not "a substantial likelihood that the person will inflict serious bodily harm upon another person within the immediate future" by reason of the person's mental condition. Regardless of the phrasing, the statute clearly requires proof *to the Court's satisfaction* that the patient is *not* dangerous. It would strain the statute beyond recognition to require the Court to declare itself "satisfied" that the patient is safe to release whenever the State cannot prove the inverse (i.e., that the patient is dangerous) by clear and convincing evidence. Moreover, such a construction, if adopted solely for purposes of constitutional avoidance, would only apply in the unusual case of an incompetent defendant who

---

[159] *Curran*, 104 A.2d at 387; *see Mills*, 256 A.2d at 758.
[160] *See supra* note 72.

40

cannot be restored to competency in the foreseeable future, whilst leaving the burden of proof on the patient in all other cases.

Since no plausible or workable construction would render a Section 403 hearing constitutionally adequate, the Court sees no value in requiring Mr. Topolski to go through such a hearing prior to obtaining relief by other means. The only constitutionally adequate procedure to justify continued commitment currently authorized by statute in Delaware is an involuntary civil commitment pursuant to 16 *Del. C.* ch. 50. This Court's authority on a petition for a writ of habeas corpus, however, is limited to granting prompt release. In light of the lack of precedent for this step, the Court requires supplemental briefing on an expedited schedule addressing the procedural steps necessary to implement the Court's holding in this Opinion. The parties' submissions should address the procedural requirements under Delaware habeas corpus law and any logistical issues necessary to implement this decision and ensure Mr. Topolski's timely release from custody.

**CONCLUSION**

For the foregoing reasons, the Court concludes that indefinite detention pursuant to 11 *Del. C.* §§ 403 and 404 is unconstitutional as applied to incompetent defendants who are unlikely to be restored to competency in the foreseeable future.[161] Relatedly, the Court holds that the statutory remedy provided by 11 *Del. C.* § 403(b) is not an adequate mechanism to test the legality of Mr. Topolski's continued confinement. **The parties are directed to submit supplemental**

---

[161] Since this is an as-applied challenge to the statutory scheme, this holding is limited to the specific scenario presented here—an incompetent defendant without a substantial likelihood of competency restoration in the foreseeable future. *See Delaware Bd. of Med. Licensure & Discipline v. Grossinger*, 224 A.3d 939, 956 (Del. 2020) ("A facial challenge alleges that a statute or regulation is not valid under any set of circumstances; an as-applied challenge alleges that a statute or regulation is not valid in the particular circumstances of the case."). In most cases, confinement pursuant to 11 *Del. C.* § 404 for competency restoration purposes is not vulnerable to an equal protection or due process challenge because such confinement is rationally related to the state's interest in competency restoration and serves a distinct purpose from civil commitment.

**briefing, including citation to relevant legal authority, on or before July 7, 2023, stating their positions on the next appropriate steps to implement Mr. Topolski's release from custody. Responses to these submissions, if any, must be filed on or before July 14, 2023. Since the Court has already ruled on the substantive merits of the statutory and constitutional arguments presented, the submissions should be limited to matters of procedure.** As with the parties' previous supplemental submissions following the February 7, 2023, Memorandum Opinion and Order, the briefing may be in letter form. The submissions should not exceed six pages, single-spaced.

Noel Eason Primos, Judge

NEP/tls
*Via Email*
oc: Prothonotary
cc: Counsel of Record

42